*In re* CHRISTOPHER K., a Minor (The People of the State of Illinois, Plaintiff-Appellee, v. Christopher K., Defendant-Appellant).

First District (5th Division) No. 1—02—0230

Opinion filed May 7, 2004.

CAMPBELL, P.J., specially concurring in part and dissenting in part.

Northwestern University Legal Clinic, of Chicago (Cathryn S. Crawford, Thomas F. Geraghty, Stuart Katz, Greta Jacobs, Ashley Baynham, and Steve Cohn, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Susan Schierl Sullivan, Alan Spellberg, and Annette Collins, Assistant State's Attorneys, of counsel), for the People.

JUSTICE REID delivered the opinion of the court:

Following the granting of a motion to have this minor defendant's case designated as an extended jurisdiction juvenile (EJJ) proceeding (705 ILCS 405/5—810 (West 1998)), Christopher K. (C.K.) was adjudicated by a jury to be delinquent by virtue of having committed first-degree murder. C.K. is appealing both the conviction and the sentence. For the reasons that follow, we affirm C.K.'s conviction and sentence as modified.

## BACKGROUND

On January 31, 1999, C.K. was arrested and taken into custody for the homicide of Willie Lomax, a 16 year old. Lomax was shot and killed on January 23, 1999. The State filed a delinquency petition against the 14-year-old C.K. Thereafter, C.K. was charged in juvenile court with first-degree murder for the shooting. The State then unsuccessfully sought to have him transferred to adult court for prosecution. The State immediately appealed the trial court's denial of the motion to transfer the matter to adult court. This court affirmed the juvenile court's denial of the State's motion to transfer. *In re C.K.*, No. 1—99—3175 (February 9, 2001) (unpublished order under Supreme Court Rule 23).

After the failure to have the matter transferred for adult prosecution, the State requested the trial court designate the matter as an EJJ proceeding. The trial court granted that motion. C.K. was then tried, convicted and received a two-part sentence. First, he would be committed to the Juvenile Division of the Illinois Department of Corrections (IDOC) for 5 years or until he reaches the age of 21, whichever

comes first. Second, when he turns 21, C.K. will spend the next 40 years in the adult Department of Corrections. Pursuant to the EJJ statute, the adult portion of the sentence was stayed until further order of the trial court.

## Pretrial Motions

At the hearing on the motion to transfer, Detective Steve Buglio testified on the issue of probable cause. Detective Buglio testified that, during his investigation of the shooting, he learned that Lomax, Terrell Montgomery and Willie Griffin were walking down the street when they saw a white car full of people. Those people began flashing gang signs. Shortly thereafter, one male got out of the car, ran up and fatally shot Lomax. Griffin gave a description of the shooter as a white or Hispanic male in his late teens, 5 feet 6 inches tall, thin build, with short hair or a shaved head. Griffin indicated the shooter was wearing a Dallas Cowboys jacket with a hooded sweatshirt beneath. Griffin also described and suggested the name of a possible owner of the car.

Detective Buglio testified that he received an anonymous tip from a female caller claiming to have information about the shooting. The caller and three other people were driving in a car matching the description Detective Buglio had. The woman claimed C.K. was one of the people in the car and the person who shot Lomax.

On January 26, 1999, Detective Buglio spoke with Melissa Quinn, one of the people in the car. Quinn told Detective Buglio that she was driving with two men when they encountered C.K. C.K. told the men in the car that members of the Black Stones street gang were nearby. C.K. then allegedly left to go get something and returned to the car. They drove around the neighborhood until they encountered the Black Stones. The driver pulled the car in the alley and C.K. exited the car. Detective Buglio testified that 20 to 30 seconds later Quinn heard a single gunshot and, within seconds, C.K. returned to the car indicating that "I think I got one. I seen them go down. I smell like gunpowder. There's only one shell in the gun."

Detective Buglio then asked police officers familiar with the Two-Six street gang for help locating C.K. While the officers were collecting information on C.K., Detective Buglio continued his investigation by speaking with Jessica Cosgrove, the owner of a white, four-door Ford Escort. Detective Buglio believed that was the car involved in the shooting. Cosgrove indicated that she made changes to her car following the shooting out of a fear of getting in trouble with the police. Cosgrove's account of the shooting was similar to Quinn's. Both Quinn and Cosgrove gave written statements to the police, testified before the grand jury and positively identified C.K. as the shooter.

C.K. was arrested by Officer Herhold, who initially had gone to his house to speak with C.K.'s mother. Officer Herhold visited C.K.'s mother's house six times. C.K.'s mother denied having seen C.K. On January 31, 1999, Officer Herhold took C.K.'s mother with him when he arrested C.K. C.K. does not challenge the claimed probable cause for his arrest. C.K. gave oral and written statements in which he admitted to shooting Lomax.

The trial court denied the motions to quash because, based upon the totality of the circumstances, the trial court felt there was probable cause. In addition to the motions to quash, C.K. argued that the police violated his constitutional rights because, although the arresting officer read them, he was not read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), by the interrogating detectives.

As to the motion to suppress, C.K. claims the police violated his rights by failing to have a youth officer present during interrogation, forcing him to undergo interrogation when he allegedly lacked the physiological, mental, educational, and emotional states and capacities to fully understand the meaning of the *Miranda* rights. In short, he alleged the confession was the result of coercion. Officers Egan and Herhold testified that C.K. never indicated he did not understand the *Miranda* rights. They also denied coercing C.K.

At the conclusion of the hearing, the trial court denied the motions to quash and suppress. The trial court indicated that, "considering the totality of the circumstances and the information that all the police knew at the time that [C.K.] was arrested, despite the fact that there was no arrest warrant, I believe that the police had probable cause to make [an] arrest."

When Officers Herhold and Egan transported C.K. to the Area One police facilities, he was in the backseat of the police car with his mother. C.K. claims he was told by the officers that he would be "going down" like Vincent Fox. The officers respond that, while they engaged in small talk, no such threats were made. C.K. arrived at Area One at approximately 3:20 or 3:25 p.m. He was met by Detectives Buglio and Winstead. With his mother present, C.K. was "Mirandized" by Detective Winstead. When asked if he understood the nature of the *Miranda* warnings, C.K. indicated that he did. Detective Winstead claims that after he read the rights, C.K. asked if he needed a lawyer. The detective responded that "that's not my call." C.K.'s mother told her son to "just tell him the truth." According to C.K.'s mother, C.K. first indicated he thought he might need to speak with a lawyer, then he asked the police if he did. C.K.'s mother claims the police responded to C.K.'s question by asking him if he wanted to

make a statement. At that point, C.K.'s mother indicated that she had not had an opportunity to speak privately with her son. The detectives then allowed C.K. and his mother to speak alone for approximately 90 minutes while a lineup was being prepared.

The detectives returned to the interview room at 5 p.m. to see if C.K. or his mother needed anything. C.K. testified that, at this point, Detective Buglio showed his gun and asked for the location of the murder weapon. The detectives dispute the claim that C.K. was threatened with jail, that a gun was ever waved in his face or that any promises were made to induce him to make a statement. C.K. also claims he was not in his right state of mind because he was worried about his mother. C.K. further claimed that Detective Buglio told him he would sit at the station until he talked.

C.K. participated in the lineup at approximately 5 p.m. C.K. was viewed by Griffin, who had previously identified Vincent Fox as the shooter. Griffin was not able to make a positive identification of C.K. The detectives indicated that Griffin had suggested that C.K. resembled the person who shot his friend.

After the lineup, C.K. and his mother were placed in another interview room. Present were Detectives Buglio and Winstead, as well as youth investigator Bailey. C.K., again with his mother present, was read his *Miranda* rights. Both he and his mother indicated the rights were understood. After answering questions for 30 to 40 minutes, the detectives left to go contact the State's Attorney. When Assistant State's Attorney Adam Monreal (ASA Monreal) arrived, he went with the detectives into the interview room. After another 30 to 40 minutes of conversation, during which ASA Monreal indicated that he was not C.K.'s lawyer, C.K. chose the option of a court-reported statement. The court reporter arrived at approximately 9:30 p.m. ASA Monreal read C.K. his *Miranda* rights. Though he told ASA Monreal he understood the *Miranda* rights, C.K. testified that he did not.

The trial court denied the motion to suppress the statement because, to a great degree, C.K. was read his *Miranda* warnings, gave assent to each warning, had his mother present for most of the day, was able to speak alone with his mother, and had a youth officer present who did not serve as the questioner. The trial court also found that C.K.'s question "Do I need an attorney?" was not an invocation of his constitutional rights.

Following the hearings, the State moved to have the proceedings designated as an EJJ proceeding. C.K. objected because the State had previously unsuccessfully moved to have the matter transferred to adult court. C.K. also claimed the EJJ statute was unconstitutional. Specifically, C.K. objected that the State presented no evidence related

to the statutory factors that the court was required to consider before designating a case as an EJJ prosecution.

The matter thereafter proceeded to trial. C.K.'s statement was admitted into evidence against him. The jury convicted C.K. of first degree murder.

## ANALYSIS

### The Law of the Case

C.K. argues on appeal that the State was prohibited from seeking and receiving an EJJ designation after unsuccessfully appealing the trial court's denial of the motion to transfer under the rule of the law of the case. C.K. maintains that many of the factors the trial court is to consider are the same. C.K. argues that, in a discretionary transfer situation, the burden remains on the State. In an EJJ proceeding, the burden shifts such that, once the State meets its initial burden, the minor must demonstrate that EJJ designation is not appropriate. C.K. argues that, despite the differences, the ultimate issue in both the EJJ designation proceeding and the motion in juvenile court to transfer to adult court is whether C.K. should be subject to an adult sentence. This court affirmed the trial court's denial of the motion to transfer. C.K. argues that, implicit in that ruling is the notion that an adult sentence is not appropriate. C.K. argues this amounts to multiple bites of the apple. C.K. argues that the rule of law of the case should apply to stop the State from reraising the issue of adult punishment.

The State responds that the doctrine of law of the case is not applicable where the two statutes do not involve the same legal inquiry, do not have the same effect or purpose and are not mutually exclusive. The State maintains that the EJJ designation is a way for the legislature to deal with juvenile problems by providing an option for dealing with more serious offenders. The State argues that a plain reading of the two provisions demonstrates that the transfer provision and the EJJ designation are not mutually exclusive. The State argues that one major difference between transfer and an EJJ designation is the consideration of the best interest of the public. That is an element of transfer, but not of an EJJ designation. If a minor is found subject to transfer, he or she serves the sentence in adult prison. By contrast, in an EJJ proceeding, a guilty defendant does not see adult prison until he or she reaches the age of 21. Further, the State maintains that an EJJ sentence does not result in the inevitable imposition of an adult sentence. The adult sentence can be vacated if the minor completes the juvenile sentence, complies with the conditions of that sentence, and does not commit a new offense during the juvenile term. The State characterizes an EJJ sentence and the potential adult

component as an incentive for the minor to neither reoffend nor violate the conditions of the juvenile sentence. The State also argues that the plain language of the statute supports its position because it states that nothing prevents the State from proceeding in a motion to transfer.

██ █ "In general, when the State petitions the court for an adjudication of delinquency, the minor is subject only to the sanctions prescribed under the [Juvenile Court] Act." *In re Matthew M.*, 335 Ill. App. 3d 276, 286 (2002), citing 705 ILCS 405/5—120 (West 2000). "The most serious of these sanctions is the minor's commitment to the juvenile division of the Department of Corrections until the minor's twenty-first birthday." *Matthew M.*, 335 Ill. App. 3d at 286, citing 705 ILCS 405/5—750 (West 2000). As an alternative under appropriate statutorily defined circumstances, "at any time prior to the commencement of the minor's trial," the State may ask the trial court to have the proceedings designated as an EJJ prosecution. 705 ILCS 405/5—810(1) (West 1998). "If the trial court agrees to designate the proceeding as an EJJ prosecution, then the court, upon finding the minor guilty, must impose one or more of the penalties provided for in section 5—710 of the [Juvenile Court] Act and a conditional adult criminal sentence." (Emphasis omitted.) *Matthew M.*, 335 Ill. App. 3d at 286, citing 705 ILCS 405/5—810(4) (West 2000). "In the event that the minor violates the conditions of his or her juvenile sentence or commits a new offense, the trial court must order the execution of the conditional adult criminal sentence." *Matthew M.*, 335 Ill. App. 3d at 286, citing 705 ILCS 405/5—810(6) (West 1998).

> "To seek the designation of the proceeding as an EJJ prosecution, the State must allege that (1) a minor 13 years of age or older committed an offense that would be a felony if committed by an adult and (2) there is probable cause to believe that the allegations in the delinquency petition and motion are true. (705 ILCS 405/5—810(1) (West 2000)). If the trial court finds that there is probable cause to believe the allegations are true, then the court must designate the proceeding as an EJJ prosecution unless the court finds, based on clear and convincing evidence, that adult sentencing would not be appropriate for the minor based on the following factors: (1) the seriousness of the alleged offense; (2) the minor's history of delinquency; (3) the minor's age; (4) the minor's culpability in committing the alleged offense; (5) whether the offense was committed in an aggressive or premeditated manner; and (6) whether the minor used or possessed a deadly weapon when committing the alleged offense. 705 ILCS 405/5—810(1)(b) (West 2000)." *Matthew M.*, 335 Ill. App. 3d at 286.

The law is replete with alternatives such as the way EJJ prosecu-

tions work in the juvenile justice arena. This speaks to judicial discretion and the ability to craft sentences so as to balance the competing interests our society has in punishment and rehabilitation. However, there are instances when discretion must yield to timing. By that, we mean that the right to proceed as an EJJ prosecution is not unfettered. The legislature clearly contemplated the simultaneous filing of motions for EJJ designation and transfer in stating that "[n]othing in [the EJJ section] precludes the State from filing a motion for transfer under Section 5—805." 705 ILCS 405/5—810(8) (West 1998). The State chose not to proceed simultaneously in the alternative. We believe that, based upon the timing of the events in this case and the doctrine of the law of the case, an EJJ proceeding ceased to be available when the issue of transfer was resolved by this court.

■ "Under the law of the case doctrine, a rule established as controlling in a particular case will continue to be the law of the case, as long as the facts remain the same." *People v. Rodriguez*, 313 Ill. App. 3d 877, 884 (2000), citing *People v. Patterson*, 154 Ill. 2d 414, 468 (1992). "The preclusion doctrines of *res judicata*, collateral estoppel and law of the case prevent a defendant from 'taking two bites out of the same appellate apple.' " *People v. Tenner*, 206 Ill. 2d 381, 395 (2002), quoting *People v. Partee*, 125 Ill. 2d 24, 37 (1988). "However, the doctrine is not applicable where either different parties or issues are involved." *Lake Bluff Heating & Air Conditioning Supply, Inc. v. Harris Trust & Savings Bank*, 117 Ill. App. 3d 284, 290-91 (1983), citing *Miscevich v. Commonwealth Edison Co.*, 110 Ill. App. 3d 400, 402 (1982).

■ When the trial court made its discretionary determination that C.K.'s case should not be transferred to adult court, the ultimate issue was whether he should be tried and punished as an adult. Though the EJJ mechanism offers an extra opportunity for a juvenile defendant to avoid an adult sentence by fulfilling the conditions of his juvenile sentence, the ultimate issue is also whether that defendant should be punished as an adult. Law of the case prohibits the State from seeking an EJJ designation following the unsuccessful attempt at an ordinary transfer.

## Juvenile Court Act

C.K. next argues that the designation of his case as an EJJ proceeding after the trial court determined that he should be sentenced under the Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 1998)) (the Act) is contrary to the legislative intent of the Act. C.K. maintains that an EJJ proceeding is an alternative to transfer proceedings. C.K. argues that the EJJ statute should not be

allowed to be used as a second chance for the State to avoid a judicial finding that it is in the minor's and public's interest that the minor be adjudicated and sentenced under the Act:

"When the EJJ provisions were added to the Juvenile Court Act, the legislature adopted the 'balanced and restorative justice model' of juvenile justice, attempting to strike a balance between punishment and treatment."

The State responds that the application of the EJJ statute following a denial of a motion to transfer is not prohibited by the plain language of the statute nor is it contrary to the legislative intent. The State maintains that it is not necessary to go to the legislative history when the plain language of the statutes is clear. The State argues the statutory language contains no prohibition against prosecution under the EJJ statute following the denial of a motion for discretionary transfer. The State argues that the purpose of the Juvenile Court Act has changed in recent years away from pure rehabilitation toward a combination of that and concern for juvenile accountability and public safety.

■ The EJJ statute allows for simultaneous motions for an EJJ proceeding and for ordinary transfer under section 5—805. 705 ILCS 405/5—805 (West 1998). The rules for an EJJ proceeding and an ordinary transfer are similar, but not identical. This is significant because for an ordinary transfer under section 5—805 there are extra considerations a trial court must evaluate.

"In making its determination on a motion to permit prosecution under the criminal laws, the trial court shall consider among other matters:

(i) the seriousness of the alleged offenses; (ii) the minor's history of delinquency; (iii) the age of the minor; (iv) the culpability of the minor in committing the alleged offense; (v) whether the offense was committed in an aggressive and premeditated manner; (vi) whether the minor used or possessed a deadly weapon when committing the alleged offense; (vii) the minor's history of services, including the minor's willingness to participate meaningfully in available services, and (viii) the adequacy of the punishment or services available in the juvenile justice system." *In re C.K.*, slip op. at 7, citing 705 ILCS 405/5—805(3)(a), (b) (West 1998).

■ The EJJ statute requires the first six of those factors and not the last two. Procedurally speaking, the State got six out of the eight factors considered by the trial court and reviewed by this court in our prior order. It would be unconstitutional as applied to C.K. to allow the State, after having the higher burden of having the eight transfer factors considered and rejected, to make a second attempt under a

lesser burden. We review questions of statutory construction under the *de novo* standard. *In re D.D.*, 196 Ill. 2d 405, 418 (2001). The cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature while presuming the legislature did not intend to create absurdity, inconvenience or injustice. *D.D.*, 196 Ill. 2d at 418-19, citing *In re Application of the Cook County Treasurer*, 185 Ill. 2d 428 (1998), citing *People v. Latona*, 184 Ill. 2d 260, 269 (1998), *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 83 (1994), *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990), and *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 394 (1998). In order to comport with the Illinois Supreme Court's guidelines for the interpretation of statutes, and to ensure that the State's actions do not violate the constitution, we must conclude that the legislature intended for the transfer motions under section 5—805 and EJJ designations under section 5—810 to be made simultaneously. Any other construction of the applicable statutes would lead to an unjust result.

### *Apprendi*

C.K. next argues that the EJJ statute is unconstitutional because it requires a judge and not a jury to make a factual finding that results in an imposition of a sentence that exceeds the maximum allowed under the Juvenile Court Act. C.K. claims this is a violation of the rule in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). He claims the EJJ statute permits the imposition of a dual sentence upon a trial court's determination that there is probable cause to believe the minor committed an offense that would be a felony if committed by an adult and the trial court makes a finding that an adult sentence would not be appropriate for the minor. C.K. argues he was entitled to have a jury determine beyond a reasonable doubt whether he should receive a sentence that extends beyond his twenty-first birthday. C.K. also argues that the procedure for lifting the stay and, thereby, imposing the adult sentence violates *Apprendi*. He argues that the provision for execution of the adult portion of the sentence requires that the trial court make a finding, based upon a preponderance of the evidence, that the minor violated the conditions of the juvenile portion of his sentence. Because it uses the preponderance standard, C.K. argues the EJJ statute violates *Apprendi* and such a finding will increase his sentence by at least 35 years, well beyond that allowed for juvenile first-degree murder.

The State responds that the EJJ provisions wholly comport with *Apprendi*. In C.K.'s case, a jury found him guilty of the criminal offense of first-degree murder after considering all the evidence and

determining that each and every element of the offense had been proven beyond a reasonable doubt. None of the elements were excluded from the jury's consideration as a result of the EJJ statute. *Apprendi* has been held in Illinois inapplicable to questions of juvenile court jurisdiction. The State urges this court to treat a violation by a minor of the terms of the juvenile sentence in the same manner as any criminal defendant that violates a probation hearing. The State argues this should require only minimal due process.

■ The *Apprendi* argument, that the adult portion of the sentence amounts to a finding by the trial court based on less than "beyond a reasonable doubt" that the longer sentence is necessary, has been addressed by this court in *In re Matthew M.*, 335 Ill. App. 3d 276 (2002). In *Matthew M.*, the Second District of this court held:

"An EJJ prosecution, like a section 5—805(2) transfer, requires the trial court to make a procedural determination as to whether the juvenile should receive an adult sentence under chapter V of the Unified Code of Corrections (730 ILCS 5/5—1—1 et seq. (West 2000)). The only difference between section 5—805(2) and an EJJ prosecution is that the adult sentence in an EJJ prosecution is stayed pending the juvenile's successful completion of the juvenile sentence. Because the trial court's determination to designate a proceeding as an EJJ prosecution does not adjudicate the minor's guilt, due process would not require a jury to make such a procedural determination. [See *People v. Beltran*, 327 Ill. App. 3d 685, 691 (2002).] Although we agree with respondent that, in designating a proceeding as an EJJ prosecution, the trial court may make findings that expose him to a greater sanction, he has no due process right to have a jury make those findings. We therefore hold that, for the same reasons articulated in *Beltran*, *Apprendi* is inapplicable to the present case." *Matthew M.*, 335 Ill. App. 3d at 289.

As in *Matthew M.*, we conclude that, although proof beyond a reasonable doubt is required during the adjudicatory stage of a juvenile hearing, that standard does not apply to the dispositional stage of a juvenile prosecution. *Matthew M.*, 335 Ill. App. 3d at 288, citing *People v. Beltran*, 327 Ill. App. 3d 685 (2002), citing *In re Winship*, 397 U.S. 358, 359 n.1, 25 L. Ed. 2d 368, 372 n.1, 90 S. Ct. 1068, 1070 n.1 (1970). " 'Because *Apprendi* bears only on the process due in criminal proceedings, the case is simply inapplicable here.' " *Matthew M.*, 335 Ill. App. 3d at 288, quoting *People v. Beltran*, 327 Ill. App. 3d at 690-91.

### Vagueness

C.K. next argues that the EJJ provision of the Juvenile Court Act is unconstitutionally vague because it fails to give proper notice as to what actions are sufficient to trigger the stay-lifting mechanism. He

argues the statute is not sufficiently clear as to inform C.K. of the standard to which he would need to conform his conduct. C.K. also argues the EJJ statute is vague because the trial court failed to specify the conditions under which a violation will predicate the imposition of an adult offense. He argues the EJJ provision fails to specify the type of new offense necessary to justify the imposition of the adult sentence. C.K. claims the term "new offense" has not been described with particularity. C.K. also argues the EJJ statute encourages arbitrary and discriminatory enforcement and has been applied to him in an unconstitutional manner. Specifically, C.K. argues the trial court did not outline conditions he needed to fulfill in order to successfully complete the juvenile portion of his sentence.

The State responds that C.K. is without standing to mount a facial and "as applied" challenge to the statute where the provisions of the EJJ statute have no bearing on the present controversy. The State reminds this court that the issue at the center of this controversy is whether C.K.'s case should have been designated as an EJJ proceeding. The State maintains that C.K. lacks standing to challenge the EJJ statute's imposition of an adult sentence because he has not suffered any present injury in need of redress. The State maintains that C.K.'s adult portion of the sentence may, by operation of law, never be implemented. Even if this court would find the sentencing provision constitutionally vague, that finding would have no impact on C.K. in this case. The State argues it would be in the nature of an advisory opinion.

The State argues in the alternative that the language of the statute and the sentence are sufficiently specific as to the possible events that would trigger the imposition of the adult sentence. Section 5—810(6) explains the two conditions under which the adult sentence will be imposed as: (1) a violation of the terms of the juvenile portion of the sentence; and (2) the commission of a new offense. 705 ILCS 405/5—810(6) (West 1998). If the minor does not do either of those two things, the adult portion of the sentence is vacated by operation of law. To entertain C.K.'s arguments, this court would have to accept his premise that the statute provides no guidance as to the meaning of the terms "offense" and "conditions." The State argues that it is the trial court and not the legislature that defines the conditions in each case based upon its unique circumstances. Though C.K. claims he does not know whether getting a disciplinary ticket for a technical violation of a regulation within the IDOC or doing poorly in school would result in the stay being lifted, the State argues such confusion is unwarranted. The State argues the very obvious condition means C.K. should complete the terms of his juvenile sentence. By extension, the State

argues that would include complying with all the rules. Because C.K. is afforded notice of that requirement, his vagueness challenge must fail. As to the term "offense," the State responds that it clearly means that the minor must commit no criminal offense during the term of his or her juvenile sentence.

■ The question before us is whether the EJJ provision of the Juvenile Court Act is unconstitutionally vague. "Statutes are presumed constitutional, and a party challenging the constitutionality of a statute has the burden of establishing its invalidity." *People v. Law*, 202 Ill. 2d 578, 582 (2002).

> "A criminal law may be declared unconstitutionally vague for either of two independent reasons. First, the statute may fail to provide the kind of notice that would enable a person of ordinary intelligence to understand what conduct is prohibited. *City of Chicago v. Morales*, 527 U.S. 41, 56, 144 L. Ed. 2d 67, 80, 119 S. Ct. 1849, 1859 (1999); see *People v. Izzo*, 195 Ill. 2d 109, 113 (2001); *People v. Warren*, 173 Ill. 2d 348, 356 (1996); see also *Grayned v. City of Rockford*, 408 U.S. 104, 108, 33 L. Ed. 2d 222, 227, 92 S. Ct. 2294, 2298-99 (1972) (due process requires that a statute 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly'). Second, a statute may be declared unconstitutionally vague if it fails to provide explicit standards for those who apply it, thus authorizing or even encouraging arbitrary and discriminatory enforcement. *Morales*, 527 U.S. at 56, 144 L. Ed. 2d at 80, 119 S. Ct. at 1859; see *Grayned*, 408 U.S. at 108-09, 33 L. Ed. 2d at 227-28, 92 S. Ct. at 2299; *Izzo*, 195 Ill. 2d at 113; *Warren*, 173 Ill. 2d at 356." *Law*, 202 Ill. 2d at 582-83.

■ "In construing the meaning of a statute, the primary objective of this court is to ascertain and give effect to the intention of the legislature." *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 279 (2003), citing *In re Detention of Lieberman*, 201 Ill. 2d 300, 307 (2002), and *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). "All other rules of statutory construction are subordinate to this cardinal principle." *Cryns*, 203 Ill. 2d at 279, citing *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001), and *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 387 (1998). "We ascertain the intent of the legislature by examining the language of the statute, which is 'the most reliable indicator of the legislature's objectives in enacting a particular law.' " *Cryns*, 203 Ill. 2d at 279, quoting *Michigan Avenue National Bank*, 191 Ill. 2d at 504, and citing *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001). "The language of the statute must be afforded its plain, ordinary and popularly understood meaning (*Lieberman*, 201 Ill. 2d at 308; *Bubb v. Springfield*

*School District 186*, 167 Ill. 2d 372, 381 (1995)), and we are to give the statutory language the fullest, rather than the narrowest, possible meaning to which it is susceptible (*Lake County Board of Review v. Property Tax Appeal Board*, 119 Ill. 2d 419, 423 (1988)). This court will not depart from the plain language of a statute by reading into it exceptions, limitations or conditions that conflict with the express legislative intent. *Petersen v. Wallach*, 198 Ill. 2d 439, 446 (2002); *Yang*, 195 Ill. 2d at 103." *Cryns*, 203 Ill. 2d at 279. "All provisions of a statutory enactment are viewed as a whole." *Cryns*, 203 Ill. 2d at 279, citing *Michigan Avenue National Bank*, 191 Ill. 2d at 504; *Bubb*, 167 Ill. 2d at 382. "Therefore, words and phrases must be interpreted in light of other relevant provisions of the statute and must not be construed in isolation." *Cryns*, 203 Ill. 2d at 279-80, citing *Sylvester*, 197 Ill. 2d at 232; *Michigan Avenue National Bank*, 191 Ill. 2d at 504. "Each word, clause and sentence of the statute, if possible, must be given reasonable meaning and not rendered superfluous." *Cryns*, 203 Ill. 2d at 280, citing *Sylvester*, 197 Ill. 2d at 232.

 According to section 5—810(6), the adult criminal sentence may be imposed in either of the two following circumstances:

> "When it appears that a minor convicted in an extended jurisdiction juvenile prosecution under subsection (1) has *violated the conditions of his or her sentence, or is alleged to have committed a new offense* upon the filing of a petition to revoke the stay, the court may, without notice, issue a warrant for the arrest of the minor. After a hearing, if the court finds by a preponderance of the evidence that the minor committed a new offense, the court shall order execution of the previously imposed adult criminal sentence. After a hearing, if the court finds by a preponderance of the evidence that the minor committed a violation of his or her sentence other than by a new offense, the court may order execution of the previously imposed adult criminal sentence or may continue him or her on the existing juvenile sentence with or without modifying or enlarging the conditions. Upon revocation of the stay of the adult criminal sentence and imposition of that sentence, the minor's extended jurisdiction juvenile status shall be terminated. The on-going jurisdiction over the minor's case shall be assumed by the adult criminal court and juvenile court jurisdiction shall be terminated and a report of the imposition of the adult sentence shall be sent to the Department of State Police." (Emphasis added.) 705 ILCS 405/5—810(6) (West 1998).

We disagree with the defendant's theory that the EJJ statute is unconstitutionally vague. In order to be eligible to have the adult portion of the sentence vacated, a defendant must successfully complete the juvenile portion of the sentence. We believe that a reasonable

mind would interpret the term "offense" as included in the EJJ statute to mean a criminal offense. As the Illinois Supreme Court instructs, "[i]f a statute can be made more definite by a reasonable construction, the court must give the statute that interpretation." *East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399, 425 (1997), citing *People v. Lang*, 113 Ill. 2d 407, 455 (1986). Because the EJJ statute covers both the failure to comply with the juvenile sentence *and* the commission of a new offense, we find it reasonable to assume that "offense" means something that would, if done without any previous history, subject a minor to a juvenile sentence. In context of the entire Juvenile Court Act, we find the legislature must have meant "offense" as a criminal offense as such is defined in the Criminal Code.

### Ineffective Assistance of Counsel and Related Trial Court Error

C.K. next argues that, under the EJJ provisions, once the State has met its initial burden of proof that a minor qualifies for EJJ designation, the burden shifts to the defendant to prove by clear and convincing evidence that the case should not be designated as an EJJ prosecution. The trial court must look at the statutory factors in making this determination. C.K. argues he received ineffective assistance of counsel because his lawyer failed to present any evidence on those statutory factors. C.K. argues the failure to present evidence was as a result of a misapprehension of the law, not a strategic decision. The lawyer indicated to the court that she believed the EJJ rules did not allow her to present mitigating evidence. She believed the trial court had no discretion and so there was nothing for the defense to do. C.K. maintains there was evidence dealing with lack of criminal history, need for therapeutic intervention, amenability to services in the juvenile court, and expert testimony of why an adult sentence would be inappropriate that could have been presented, but the trial counsel failed to do so. Because the judge who evaluated the EJJ petition was not the same judge who heard the prior motion to transfer, he was deprived of critical information in making the determination. C.K. also argues that the trial court's failure to take evidence regarding the relevant factors makes the EJJ designation void. C.K. also argues that, in light of the claimed ineffective assistance of counsel, the trial court should have fulfilled an independent duty to inquire into the factors relevant to an EJJ designation.

The State responds that, in terms of what was relevant to the EJJ determination, C.K. received effective assistance of counsel. The EJJ statute does not enumerate the factors cited by C.K. as being ap-

propriate considerations. While these may be relevant considerations for a transfer determination, the State argues they are not relevant to an EJJ determination. The EJJ statute lists the relevant factors as the seriousness of the offense, the history of delinquency, age, culpability in the commission of the offense, whether the offense was committed in an aggressive and premeditated manner, and whether a deadly weapon was used and/or possessed at the time. The State argues the juvenile court is not asked to assess the factors cited by C.K. The State maintains that the evidence showed probable cause to believe that C.K. shot an unarmed rival gang member merely because of his gang membership. C.K.'s counsel presented evidence detailing what the detectives, police officers, and assistant State's Attorney would say to attempt to rebut the claim of probable cause. Their testimony would also go toward the claim that C.K. did not do the crime at all. After considering all the evidence from both sides, the judge granted the motion for the EJJ designation. The State also argues that, to the extent that C.K. now claims his counsel failed to present sufficient evidence, he fails to point to any real evidence regarding how the seriousness of the offense, his criminal history, his age, or his culpability for the crime would militate against the application of the EJJ statute. He also fails to mention that the offense was committed in an aggressive and premeditated manner with a deadly weapon. Accordingly, the State argues not one of the statutorily sanctioned considerations inures in his favor. The State emphasizes that it would be improper for this court to interject transfer factors into an EJJ inquiry. The State also argues that the trial court considered that which it was supposed to consider. The EJJ designation is not void. As to the alleged trial error for failure to conduct an independent inquiry into the EJJ factors, the State argues that the trial court considered every appropriate factor before making its determination.

◾ "The sixth and fourteenth amendments of the United States Constitution guarantee the fundamental right of a defendant in a criminal case to be effectively assisted by counsel." *People v. Spann*, 332 Ill. App. 3d 425, 429 (2002), citing U.S. Const., amends. VI, XIV. "Effective assistance of counsel refers to competent, not perfect, representation." *Spann*, 332 Ill. App. 3d at 430, citing *People v. Odle*, 151 Ill. 2d 168, 173 (1992). The Illinois Supreme Court has repeatedly held that "[t]o demonstrate ineffective assistance of counsel, defendant must show (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that the attorney's deficient performance resulted in prejudice to the defendant." *People v. Villarreal*, 198 Ill. 2d 209, 228 (2001), citing *People v. Williams*, 181 Ill. 2d 297, 320 (1998); *Strickland v. Washington*, 466 U.S. 668, 687, 80 L.

Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). "In order to establish an ineffective-assistance-of-counsel claim, a defendant must show that 'there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Brooks*, 334 Ill. App. 3d 722, 725-26 (2002), citing *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Enis*, 194 Ill. 2d 361, 376-77 (2000), citing *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Evans*, 186 Ill. 2d 83, 93 (1999); *Brooks*, 334 Ill. App. 3d at 725-26. There is a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. *Enis*, 194 Ill. 2d at 376-77, citing *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Enis*, 194 Ill. 2d at 377, citing *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699; 104 S. Ct. at 2069; *People v. Wilson*, 191 Ill. 2d 363, 370 (2000). "In *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984), the Illinois Supreme Court adopted the *Strickland* rule that the 'benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result' and that '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Spann*, 332 Ill. App. 3d at 429, quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

When the claimed error is based on trial strategy, trial counsel's decisions are generally immune from claims of ineffective assistance of counsel. *People v. Reid*, 179 Ill. 2d 297, 310 (1997), citing *People v. Madej*, 177 Ill. 2d 116, 148 (1997). The Illinois Supreme Court has carved out an exception to this general rule when the strategy chosen is "so unsound that counsel entirely fails to conduct meaningful adversarial testing." *Reid*, 179 Ill. 2d at 310, citing *Madej*, 177 Ill. 2d at 149. "Counsel's performance is measured by an objective standard of competence under prevailing professional norms." *People v. Arroyo*, 339 Ill. App. 3d 137, 155 (2003), citing *People v. Smith*, 195 Ill. 2d 179, 188 (2000).

In light of our determination that the trial court erred in granting the State's motion to make C.K.'s case an EJJ prosecution, we decline to reach the substance of either the ineffective assistance of

counsel claim or the claim of judicial error for failure to conduct an independent investigation into the adequacy of the EJJ factors. Both of these issues are rendered moot by our decision. We need not discuss these matters further.

## Motions to Suppress and Quash Arrest

C.K. next argues that the trial court erred on two fronts. First, the trial court erred when it denied C.K.'s motion to suppress the statement. C.K. argues that he invoked his right to counsel which the police investigators ignored. C.K. also argues that the youth officer and C.K.'s mother took no actions to ensure that C.K. understood his rights. As such, C.K. argues their presence was immaterial and may have contributed to the coerciveness of the environment. C.K. argues that his mother was in no position to help him because she had been harassed by the police in the days leading up to C.K.'s arrest. C.K. also argues that no one took the time to explain to him the meaning of the rights he said he understood. This was combined with his lack of experience with the criminal justice system, the seven-hour interrogation, his mother's hysteria, and the officers' threats. C.K. argues that the totality of the circumstances makes the statement involuntary.

C.K. further argues that the arrest should have been quashed and the resulting confession suppressed. C.K. maintains the arrest was the product of an unlawful seizure. Second, if there was probable cause it was based on illegally seized evidence. C.K. argues the police lacked specific or credible evidence to arrest him. While the police had the name "Little Chris," they lacked a physical description. Griffin had identified another boy as the shooter. When the officers went to C.K.'s mother's house, they did not gather additional evidence, specifically any evidence that C.K. traveled under the name "Little Chris." The single piece of evidence obtained at C.K.'s mother's house was a photograph of C.K. The State failed to establish that the officers knew that the person in the photograph shown to witnesses at the grand jury was in fact C.K. C.K. argues that his mother did not give the police permission to do more than a general search of her premises and did not give permission for anything to be removed from the house.

The State responds that the trial court properly denied the motion to suppress where the evidence established that C.K. did not request an attorney, did not refuse to speak with the police, was provided *Miranda* warnings that he indicated he understood, and was accompanied by and got the chance to speak alone with his mother at most stages of the interrogation. The State argues there is nothing in the record to suggest that C.K. could not articulate for himself if he

felt he wanted an attorney present. As to the motion to quash the arrest, the State argues the trial court did not err because C.K. was known to police and in the community as Little Chris. The State also argues that witnesses identified C.K. as Little Chris.

 "A motion to suppress statements presents the court with a mixed question of law and fact." *People v. Flores*, 315 Ill. App. 3d 387, 391 (2000), citing *People v. Kidd*, 175 Ill. 2d 1, 25-26 (1996). "Where the facts are essentially uncontroverted and the credibility of witnesses is not at issue, *de novo* review is appropriate." *Flores*, 315 Ill. App. 3d at 391-92, citing *People v. Oaks*, 169 Ill. 2d 409, 447-48 (1996). However, where the facts are in dispute, "[w]hen reviewing a trial court's decision on a motion to suppress statements, we give deference to that court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence." *People v. Graham*, 339 Ill. App. 3d 1049, 1054 (2003), citing *People v. DeSantis*, 319 Ill. App. 3d 795, 802 (2000); *People v. Allen*, 249 Ill. App. 3d 1001, 1016 (1993), citing *People v. Gray*, 212 Ill. App. 3d 613, 616 (1991) (when a defendant who has invoked his right to counsel and to remain silent is found to have voluntarily waived such rights, the trial court's finding on the issue will not be reversed unless it is manifestly erroneous).

During the interrogation, C.K. asked Detective Winstead "Do I need a lawyer?" C.K. argues that, owing to his youth and inexperience with the police, that question was effectively an assertion of his right to counsel. C.K. argues that neither the youth officer nor his mother took actions to ensure that he understood his rights. In fact, C.K. claims the presence of his mother and the youth officer may have helped to contribute to the coercive environment. C.K. argues the trial court put too much emphasis on their presence when C.K. was interrogated.

 The law is clear that, "[u]nder *Miranda* [citation], a defendant invokes his fifth amendment protections when he asserts 'in any manner' his right to counsel. Once the accused has invoked his right to counsel, he cannot waive this right unless he has consulted an attorney or reinitiated a conversation with the officers." *People v. Tackett*, 150 Ill. App. 3d 406, 417 (1986), quoting *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981). As for asking "Do I need a lawyer?" the Illinois Supreme Court has indicated that not every reference to an attorney, no matter how vague, indecisive or ambiguous constitutes an invocation of the right to counsel. *People v. Krueger*, 82 Ill. 2d 305, 311 (1980). "The [Illinois] [S]upreme [C]ourt ruled that the officer's interpretation of the defendant's statement was reasonable because, under the circumstances, 'a more positive

indication or manifestation of a desire for an attorney was required than was made here.' " *People v. Tackett*, 150 Ill. App. 3d 406, 418 (1986), quoting *Krieger*, 82 Ill. 2d at 312. Thus an inquiry such as this must be made on a case by case basis.

 The principles of law concerning the voluntariness of a confession are well established. The test of voluntariness is whether the respondent " 'made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the [respondent's] will was overcome at the time he or she confessed.' " *In re G.O.*, 191 Ill. 2d 37, 54 (2000), quoting *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996). If so, the confession cannot be deemed the product of a rational intellect and a free will. Factors to be considered in determining whether a confession was voluntary include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by the police, including the existence of threats or promises. Additionally, consideration must be given to whether or not the defendant was informed of his constitutional rights. *People v. Fuller*, 292 Ill. App. 3d 651, 665 (1997). When a juvenile's confession is at issue, additional factors come into play, including the time of day and the presence of a parent or other adult interested in the juvenile's welfare. *People v. Brown*, 235 Ill. App. 3d 479 (1992). Courts scrutinize custodial statements by juvenile suspects with particular care, given that the potential for coercion is enhanced. The Illinois Supreme Court has recognized that the taking of a juvenile's confession is a "sensitive concern." Because of this, the "greatest care" must be taken to assure that the confession was not coerced or suggested and that " ' "it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." ' " *In re G.O.*, 191 Ill. 2d at 54, quoting *People v. Simmons*, 60 Ill. 2d 173, 180 (1975), quoting *In re Gault*, 387 U.S. 1, 55, 88 L. Ed. 2d 527, 561, 87 S. Ct. 1428, 1458 (1967).

 Although the presence of a youth officer does not *per se* make a juvenile's confession voluntary, it is a significant factor. *In re G.O.*, 191 Ill. 2d at 55; *In re Lashun H.*, 284 Ill. App. 3d 545, 557 (1996). Additional factors must be considered, such as the time of day and the presence of a parent or other adult concerned about the juvenile's welfare. *People v. Lee*, 335 Ill. App. 3d 659, 666 (2002), citing *People v. Kolakowski*, 319 Ill. App. 3d 200, 213 (2001), citing *In re J.J.C.*, 294 Ill. App. 3d 227, 234 (1998). The trial court found significant the fact that both a parent and a youth officer were present. This, coupled with the fact that C.K. and his mother repeatedly indicated to the police that they understood the *Miranda* rights. C.K.'s mother was al-

lowed to privately confer with her son more than once during the time he was being interrogated. We believe the trial court properly evaluated the relevant factors without giving undue emphasis and denied the motion to suppress.

■ The second claimed trial error resulted from the denial of C.K.'s motion to quash his arrest. C.K. argues that the police did not have probable cause to justify his arrest. "Probable cause exists for an arrest when the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime." *In re D.W.*, 341 Ill. App. 3d 517, 523 (2003), citing *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986). "Probable cause to arrest is a nontechnical concept determined according to the totality of the circumstances confronting the officers at the time of the arrest." *People v. Sims*, 167 Ill. 2d 483, 500 (1995), citing *People v. Edwards*, 144 Ill. 2d 108, 128 (1991).

"In determining whether the trial court correctly found probable cause to arrest the accused, a reviewing court is not limited to the evidence presented at the circuit court's pretrial suppression hearing, but may also consider evidence that was offered at the defendant's trial." *Sims*, 167 Ill. 2d at 500, citing *People v. Patterson*, 154 Ill. 2d 414, 450 (1992), *People v. Melock*, 149 Ill. 2d 423, 433 (1992), and *People v. Cabellero*, 102 Ill. 2d 23, 36 (1984). Commonsense and practical considerations are properly considered in viewing the totality of the circumstances surrounding the probable cause determination. *People v. Robinson*, 167 Ill. 2d 397, 405 (1995).

■ Our review of the record suggests that the decision of the trial court was the correct one. Eyewitnesses to the shooting identified the vehicle involved as belonging to Jessica Cosgrove. Another witness described the shooter with measurements and clothing similar to those of C.K. These descriptions and an anonymous tip led the officers to Jessica Cosgrove and Melissa Quinn. These witnesses provided the police with the nickname Little Chris. Once locked in on the name Little Chris, the officers with experience with C.K.'s street gang knew Little Chris and C.K. are one and the same. When the police asked, Quinn confirmed that she had long-term familiarity with C.K. "A police officer's knowledge of probable cause may be based on an informant's tip and, if the facts supplied in such a tip are essential to a finding of probable cause, the tip must be reliable." *D.W.*, 341 Ill. App. 3d at 523, citing *People v. Patterson*, 282 Ill. App. 3d 219, 227 (1996). Because Quinn knew C.K. for at least a year, and the police knew of C.K.'s street gang and the members therein, we conclude that there was probable cause to justify the arrest. Because there was probable cause to arrest C.K., the seizure of a photograph is not fruit of the poisonous tree. We need not discuss the matter further.

Sentence

■■ " 'Reviewing courts have the power and authority under Supreme Court Rule 615(b)(4) [134 Ill. 2d R. 615(b)(4)] to reduce a sentence imposed by the trial court.' " *People v. Jones*, 168 Ill. 2d 367, 376 (1995), quoting *People v. O'Neal*, 125 Ill. 2d 291, 297-98 (1988). We recognize and give appropriate deference to the trial court where it is due, but must conclude that the adult portion of C.K.'s sentence, imposed as part of the EJJ proceedings, is an error. However, because we find no error with the juvenile portion of the sentence, we reduce C.K.'s sentence of incarceration to his twenty-first birthday. We reach this conclusion after deliberate, "considerate caution and circumspection." *People v. Turner*, 156 Ill. 2d 354, 359 (1993), citing *People v. Taylor*, 33 Ill. 2d 417, 424 (1965). " '[T]he mere fact that the trial court has a superior opportunity to make a determination concerning final disposition and punishment of a defendant does not imply that a particular sentence imposed is always just and equitable.' " *Jones*, 168 Ill. 2d at 376, quoting *O'Neal*, 125 Ill. 2d at 297-98.

## CONCLUSION

In light of the foregoing, C.K.'s conviction and sentence as modified is affirmed.

Affirmed as modified.

HARTIGAN, J., concurs.

PRESIDING JUSTICE CAMPBELL, specially concurring in part and dissenting in part:

The majority opinion correctly concludes that defendant's murder conviction must be affirmed, but the holding that an EJJ transfer was unavailable in this case is contrary to our case law and the plain language of the EJJ statute. The EJJ statute allows the State to file an EJJ petition "at any time prior to commencement of the minor's trial." 705 ILCS 405/5—810(1) (West 1998). The majority opinion's contrary conclusion that the petition may *not* be filed at any time prior to trial rests on the "law of the case" doctrine, which states that, " 'a rule established as controlling in a particular case will continue to be the law of the case, as long as the facts remain the same.' " 348 Ill. App. 3d at 140, quoting *People v. Rodriguez*, 313 Ill. App. 3d 877, 884 (2000), citing *People v. Patterson*, 154 Ill. 2d 414, 468 (1992). The majority holds that the doctrine applies in this case, but the EJJ statute provides that, "[u]pon successful completion of the juvenile sentence the court *shall vacate* the adult criminal sentence."

(Emphasis added.) 705 ILCS 405/5—810(7) (West 1998). The defendant may serve an adult sentence *if new facts arise in the future* resulting in an unsuccessful completion of the sentence, though the court is not required to order execution of the adult sentence *unless* the minor later commits a new offense. 705 ILCS 405/5—810(6) (West 1998). Thus, the law of the case doctrine is inapplicable.

A rule that the State *must* move for EJJ designation and transfer simultaneously would promote judicial economy, but finds no support in the law. The majority states in *obiter dicta* that "[i]t would be unconstitutional as applied to C.K. to allow the State, after having the higher burden of having the eight [discretionary adult] transfer factors considered and rejected, to make a second attempt under a lesser burden." 348 Ill. App. 3d at 141. However, the majority cites no provision of the United States or Illinois Constitutions, or case law so holding. Thus, in this case, this court should not abandon the presumption of constitutionality afforded Illinois statutes.