# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Dionte J.*, 2013 IL App (1st) 110700

---

| | |
|---|---|
| Appellate Court Caption | *In re* DIONTE J., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Dionte J., Respondent-Appellant). |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-0700 |
| Filed<br>Rehearing denied | June 21, 2013<br>July 17, 2013 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court upheld respondent's conviction for felony murder based on mob action in the beating death of another minor pursuant to an extended jurisdiction juvenile prosecution (EJJP) and his commitment to the Department of Juvenile Justice until his twenty-first birthday with a 30-year adult sentence if he violates his juvenile sentence, notwithstanding his challenges to the conviction and the constitutionality of the EJJP statute, since the trial court properly refused to give an instruction on simple battery, under the statute in effect at the time of respondent's offense the State only had to show respondent was acting with others who used force on the victim to establish the predicate felony of mob action, the trial court did not abuse its discretion in applying the EJJP statute, and the statute did not subject respondent to increased punishment of an adult sentence without a jury finding in violation of *Apprendi*. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-JD-4630; the Hon. Colleen F. Sheehan, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Kathleen Weck, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Kathryn A. Schierl, and Annette Collins, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Lampkin and Justice Hall concurred in the judgment and opinion.

**OPINION**

¶ 1      Dionte J., age 14, was charged in juvenile court with one count of felony murder predicated on mob action in connection with the beating death of 16-year-old Derrion Albert on September 24, 2009. Upon motion by the State, the trial court designated the case as an extended jurisdiction juvenile prosecution (EJJP). After a jury trial, defendant was found guilty. At sentencing, the trial court committed defendant to the Illinois Department of Juvenile Justice until his twenty-first birthday, and imposed a 30-year adult sentence under the EJJP statute that defendant would not have to serve unless he violated his juvenile sentence.

¶ 2      On this direct appeal, defendant makes several claims, including challenges based specifically on the circumstances of his conviction, as well as constitutional challenges to the EJJP statute in general.

¶ 3      With respect to the specific circumstances of his case, defendant claims: (1) that the trial court committed reversible error by refusing to instruct the jury on misdemeanor battery, where battery is a lesser-included offense of mob action and, thus, a lesser-included offense of felony murder predicated on mob action; (2) that this court must vacate defendant's conviction for felony murder, where the same acts that formed the basis for murder also formed the basis for the predicate felony of mob action; and (3) that the trial court erred in designating defendant's case as an EJJP case, where defendant was only 14 years old with no history of delinquency, his acts involved no premeditation or use of a weapon, and he was amenable to treatment as a juvenile offender.

¶ 4      In making his first claim that the jury should have received an instruction on misdemeanor battery, defendant argues that the supreme court's decision in *People v. Davis*, 213 Ill. 2d 459 (2004), was wrongly decided. As defendant well knows, the appellate court is in no position to entertain an argument that the supreme court should be reversed. In *Davis*, the supreme court held that, when determining whether an offense is a lesser-included

-2-

offense, we must compare it to the offense of felony murder and not to the underlying felony. *Davis*, 213 Ill. 2d at 475-76. To be lesser, the offense must have an equal or lesser intent. *Davis*, 213 Ill. 2d at 477. Since felony murder does not require a particular intent, an offense that does require a particular intent, such as battery, cannot be a lesser offense. *Davis*, 213 Ill. 2d at 477. Although defendant does not like this precedent, it is the law in our state, and he knows that we must follow it.

¶ 5        In his second claim that the same act formed the basis of both murder and the underlying felony, defendant stresses his one punch of the victim, Derrion Albert. However, this argument ignores his other acts, such as his picking up a wooden board and swinging it at another person besides the murder victim, and his chasing of other victims.

¶ 6        As for his third claim that the trial court erred in designating his case as EJJP, we cannot find that the trial court abused its discretion in light of the seriousness of the offense.

¶ 7        Defendant also claims that the EJJP statute must be struck down as unconstitutional because it violates a juvenile defendant's due process rights, and because it is unconstitutionally vague. Specifically, defendant argues: (1) that the EJJP statute violates a juvenile defendant's right to due process because it subjects him to the increased punishment of a conditional adult sentence without a jury finding, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and (2) that it is unconstitutionally vague because it does not provide fair warning of the conduct that will invoke the imposition of the adult sentence. Both of these constitutional arguments were rejected by this court in a prior opinion, *In re Omar M.*, 2012 IL App (1st) 100866, and the supreme court recently cited with approval our *Apprendi* reasoning (*In re M.I.*, 2013 IL 113776, ¶¶ 43-46).

¶ 8        For these reasons, we must affirm.

¶ 9                                    BACKGROUND
¶ 10                        I. Petition for Adjudication of Wardship
¶ 11        The State's petition for adjudication of wardship, filed on November 6, 2009, originally charged defendant with three counts of first-degree murder and one count of mob action. However, on the eve of trial, the State made a motion to nol-pros the one count of mob action, as well as two of the first-degree murder counts. This left only one count of first-degree murder remaining.

¶ 12        The one remaining count charged defendant with felony murder predicated on mob action, and stated in full:

> "On or about September 24, 2009, in violation of Section 9-1(a)(3) of Act 5 of Chapter 720 of the Illinois Compiled Statutes, as amended, Dionte [J.] committed the offense of First Degree Murder, in that the above-named minor, without lawful justification, while committing a forcible felony, Mob Action, in violation of Section 720 ILCS 5/25-1(a)(1) of Act 5 of Chapter 720, struck Derrion Albert about the body and stomped on Derrion Albert's head and killed Derrion Albert with his fists, a piece of wood and his feet, during the commission of a forcible felony, to wit, mob action, Derrion Albert, and thereby causing the death of Derrion Albert."

¶ 13    The petition charges only one predicate felony for the above felony murder count, namely, mob action, and it charges only one of the three subsections of the mob action statute, section 25-1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/25-1(a)(1) (West 2008)). That subsection has since been amended but, in 2009 when this offense was committed, it stated that: "(a) Mob action consists of any of the following: (1) [t]he use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law." 720 ILCS 5/25-1(a)(1) (West 2008).

¶ 14    The felony murder statute states: "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: *** (3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 2008).

¶ 15                                    II. Pretrial Proceedings

¶ 16    On February 1, 2010, the State filed a motion to permit prosecution under the adult criminal laws of Illinois. The motion was filed pursuant to section 5-805 of the Juvenile Court Act of 1987, which permits the trial court to make a discretionary transfer from juvenile court to adult court, after it considers such factors as the age and history of the minor, the circumstances of the offense, the advantage of treatment within the juvenile justice system, and the security of the public. 705 ILCS 405/5-805(3) (West 2008) ("Discretionary transfer").

¶ 17    At the beginning of the pretrial hearing held on March 19, 2010, the State indicated that it also had a second motion, which it made in the alternative. The State moved to designate this case as an EJJP case, if the trial court denied its motion for a discretionary transfer.[1] Before ruling on the State's motions, the trial court first held a probable cause hearing and granted the State leave to proceed by proffer.

¶ 18    The prosecutor stated that, if called to testify under oath, Deon Blandon would testify that, on September 24, 2009, he was a student at Fenger Academy and that there was a fight at school that day between a boy known as "B.J.," who lived in the Altgeld Gardens housing development and who is known as a "Garden Boy," and Eugene Bailey, who lived in an area adjacent to Fenger Academy and who is known as a "Ville Boy." Those youths who live in Altgeld Gardens are known as "Garden Boys," and those who live in the area adjacent to Fenger Academy are known as "Ville Boys." Blandon later learned that there was going to be a fight after school near the railroad tracks on 111th Street. After school, he went to that area and observed Carl, also a "Ville Boy" and B.J. fighting and a large fight ensued. Blandon observed Eric Carson, another "Ville Boy," strike Derrion Albert, another Fenger Academy student, in the back of the head with a wooden board. As Albert was trying to recover from the blow, defendant struck Albert in the face with his fist and Albert fell to the ground. A crowd of "Garden Boys" then surrounded Albert and beat him.

---

[1]As the State's brief to this court observes, the State's motion in the alternative to designate this case as an EJJP case is not in the appellate record.

¶ 19    Dominic J., if called to testify under oath, would testify that he was a Fenger Academy student and defendant's cousin, and that a fight occurred at school on September 24, 2009, between B.J. and Eugene Bailey. After school, he and defendant walked with three other boys toward the 111th Street railroad tracks. The three other boys were Eric, Carl and Dantrell, and they "associated" with the "Ville Boys." After they reached the tracks, B.J. swung at Carl and the two began fistfighting. Dominic J. observed Eric hit Albert in the head with a wooden board, and Albert fell down. As Albert was trying to rise, defendant hit Albert in the face with his fist. Then others began striking and kicking Albert.

¶ 20    Dominic J. would further testify that he watched a videotape of the events which accurately portrayed the events that he had observed. The State moved, without objection from the defense, for leave to play the two-minute videotape before the court, which was granted.

¶ 21    Dr. Doherty[2], if called to testify under oath, would testify that he is a medical physician who, on September 24, 2009, treated Albert, who died that same day from the injuries sustained. Dr. Hilary McElligott, if called to testify, would testify that she is the assistant medical examiner who examined Albert's head and determined that he died of cerebral injuries caused by blunt head trauma. Detective William Sullivan, if called to testify, would testify that he arrested defendant. The State then rested.

¶ 22    The defense then made the following proffer. Vonkeshia J., if called to testify, would testify that she is defendant's mother and that his customary route home from school is to walk east on 111th Street and then past the railroad tracks. The defense then rested and, after listening to argument from both sides, the trial court made a finding of probable cause.

¶ 23    The trial court then considered the State's motion of discretionary transfer. In support of its motion, the State relied on the proffer that it had already made. In response, defense counsel moved to admit the juvenile court's social investigation pretrial report, which the trial court admitted into evidence without objection. After both sides rested, the court heard argument on the motion. The State argued that, with respect to a transfer motion, the two most important factors were any prior criminal record of the minor and the seriousness of the present offense; and that, although this minor had no prior record, the court should grant the State's motion because of the seriousness of the offense. The defense argued that defendant had thrown one punch and that was the extent of his involvement. The matter was continued and on April 9, 2010, the trial court denied the State's motion to transfer and granted the State's motion to designate the case as an EJJP case.

¶ 24                                   III. Trial

¶ 25    The State's evidence at trial consisted primarily of two videotapes of the incident and the testimony of nine witnesses, including: the victim's cousin; a teacher at Fenger Academy; four eyewitnesses to the mob action; two investigating police officers; and the assistant medical examiner who performed the autopsy.

---

[2]Dr. Doherty's first name does not appear in the appellate record.

¶ 26    The State's first witness, Latanya Albert, was the victim's cousin who identified a photograph of the victim when he was alive. The parties then stipulated that, if she was shown a photograph of the victim taken after he died, she would identify it as a photograph as he appeared in death.

¶ 27    The State's next witness, T-awanda Piper,[3] testified that she had been employed for 11 years as a "youth worker" at the Agape Community Center at 342 West 111th Street, Chicago. The center is located near the location of the fight which occurred on September 24, 2009, a half mile west of Fenger High School. At 2:45 p.m. on September 24, a receptionist at the center informed Piper that there was a fight outside the center, and Piper instructed the receptionist to call 911 and inform the dispatcher that there was "mob action on 111th Street." When Piper observed the center's security camera, she observed "a lot of kids" on 111th Street. Then, looking through a window near the receptionist's desk, she observed that "there were two groups of kids, looking as though they were going to physically agress [*sic*] one another." The minors were 10 to 15 feet from the window. Piper then left the window for about a minute and a half, and went upstairs to find other staff members. When she returned to the window, she observed "a young man hit a boy over the head with a board," and then another young man hit the same boy in the face with his fist. After the boy fell to the ground, other young men surrounded him and started to kick him.

¶ 28    Piper testified that she exited the center in order to help the injured boy, whom she later learned was Derrion Albert. After she exited, she observed several youths attempting to lift Albert up. A vehicle approached, and she asked a man in the vehicle to help her with the victim. She then carried Albert into the center, with the assistance of the unidentified man, and laid him on the floor, called for emergency medical service and checked his neck and a wrist for a pulse. Although she did not feel a pulse in the carotid artery in his neck, she felt a "pretty high" pulse in his wrist. She then learned the victim's name from his high school identification tag and called out his name. Albert gasped for breath, as though he was trying to respond. Then, the ambulance arrived and transported him to a hospital.

¶ 29    Piper testified that she later viewed two video recordings of the fight. First, she identified State's exhibit No. 4 as a DVD which she had observed. Next, she identified State's exhibit No. 5 as the videotape from the center's surveillance camera. Piper testified that both video recordings fairly and accurately depicted the fight that she had witnessed. Exhibit No. 4 was received into evidence without objection; and the State requested and received the court's permission, without objection, to publish both to the jury. As exhibit No. 4 played for the jury, Piper identified herself in the video as she pulled Albert into the center.

¶ 30    The State's next witness, Sara Muhs, testified that she is 27 years old and a math teacher at Fenger High School. On September 24, 2009, defendant was a student in her math class, and he arrived in her classroom that day with Dantrell Myles, another student. The two had just come from gym class, and defendant was wearing black and red basketball shorts along with his Fenger black polo shirt, which is part of the Fenger uniform.

¶ 31    On cross-examination, Muhs testified that, although Altgeld Gardens is located south of

---

[3]Ms. Piper spelled her first name for the court reporter with a hyphen.

Fenger High School, students from Altgeld Gardens attend Fenger High School. At an earlier time, those children attended Carver High School. However, Carver was converted into a military academy, and the students from Altgeld Gardens who did not attend the military academy had the option of attending Fenger High School.

¶ 32    Muhs testified that, during the weekend of September 26 and 27, 2009, she watched a videotape of the incident as it played on a television news broadcast, and she observed a person dressed in a black Fenger polo shirt and red and black gym shorts. However, she did not contact the police to tell them that person was defendant. Later, on October 20, she watched the videotape more closely during one of her planning periods at school and, coincidentally, later that same day, she was asked to leave her classroom to speak with two detectives.

¶ 33    During redirect examination, she testified that she was able to identify defendant in the videotape, based on her recognition of: (1) his attire; (2) other students in the videotape who are his friends; and (3) one "grainy" image of a face that she "thought" was defendant. She testified that, in the videotape, the person whom she believed to be defendant was holding a "2x4" or "a railroad tie" which was handed to Eric Carson; and then, at a later point, defendant struck a person (whom she later learned was Derrion Albert) in the head with his fist. Muhs recognized Eric Carson because he was a student in one of her math classes. In the videotape, Carson was wearing a red hoodie sweatshirt that she had observed him wearing in school.

¶ 34    On re-cross-examination, Muhs testified that she had never observed defendant with Carson prior to observing them together on the videotape. Carson was 17 years old. Muhs clarified that Carson took the wooden board from defendant before striking Albert. On re-redirect examination, Muhs testified that the videotape depicted Carson striking Albert with the wooden board and defendant striking Albert in the face with his fist. On re-recross-examination, Muhs testified that, although she did not know Albert from school, she was able to identify him in the videotape from depictions she had observed in the media.

¶ 35    Jamal Harding testified that he is 19 years old, that he lives in a neighborhood on the south side of Chicago known as "the Ville," and that he graduated from Fenger High School in June 2009, a couple of months before the offense occurred. On September 24, 2009, he was not working or in school. At 3 p.m., he exited a corner grocery store at 111th Street and Normal Avenue, and walked down 111th Street toward the railroad tracks. A number of Fenger students were also on 111th Street heading home from school.

¶ 36    Harding then observed a blue vehicle drive by, heading toward the railroad tracks, with "B.J." as a passenger. B.J. was a student whom Harding knew from Fenger High School and who lived in Altgeld Gardens. Harding observed that B.J. was "bobbing his head" up and down but Harding could not hear anything that might have been said because Harding was wearing headphones. As Harding kept walking, he crossed the railroad tracks and observed that B.J. was now out of the vehicle and was on the same side of the street as the Agape Center. There was "a rumble" and "everybody" was fighting, including B.J. Harding took off his headphones and started fistfighting with B.J. After the fight, Harding noticed Eric Carson, who was a friend from the Ville, and who was wearing a red sweatshirt.

¶ 37 Harding had watched a videotape of the incident and was able to identify on the videotape himself, defendant, Eric Carson, Albert, Dantrell Myles, Dion Blandon, and Silvonus Shannon, who was from the Gardens. Harding knew defendant as "Tito" and had observed him around the Ville. Harding knew Albert from school, and they were friends. Dantrell Myles, who was from the Ville and a Fenger student, was Harding's best friend. Dion Blandon was also a friend of Harding's and from the Ville. The State then played in court "a slowed-down version" of the videotape and asked Harding questions about what was depicted on the videotape as it played.

¶ 38 Harding testified that the tape depicted defendant with a stick in his hand and Eric Carson then taking the stick from defendant and hitting Albert. The tape also showed defendant with a fist and Harding pushing defendant. Harding explained that he pushed defendant to let him know that Harding did not want defendant to hit Albert anymore. At some point, Albert rose from the place where defendant had punched him and went to the alley, where he fell again and was surrounded by other minors. Harding testified that the tape showed Silvonus kicking Albert and jumping on Albert's head with his two feet; and B.J.'s brother Eugene swinging a stick at Albert. The tape depicted Harding, who explained at trial what he did as he stood near Albert. Harding asked Albert if he was okay, and Albert looked at Harding as though he was trying to respond but he could not talk. Harding testified that the tape then depicted defendant running after Harding, Dantrell Myles and some other youths.

¶ 39 On cross-examination, Harding agreed that, at the end of the videotape, he was depicted picking up a stick, and he explained that he did that to chase other youths away from Albert. Harding testified that, after defendant punched Albert, he walked over and told defendant not to hit Albert again. At some point after being punched by defendant, Albert was able to rise. However, Harding denied that Albert stated he was okay.

¶ 40 On cross-examination, Harding admitted that he signed a written statement at the Area 2 police station on September 26, 2009, in the presence of Detective Sullivan and a woman. The defense counsel then read the portion of the statement in which Harding stated that: after defendant punched Albert, Harding asked Albert if he was okay and Albert replied that he was; and Albert was on his feet and appeared okay. Harding acknowledged having made that statement.

¶ 41 Harding testified that he had known Eric Carson for five or six years and that he had observed Carson that afternoon as Harding entered the corner store at 111th Street and Normal Avenue. Carson was on his way home from school, and defendant was not with him. When Harding exited the store, he observed a number of people walking home and heading in different directions. Harding walked toward the railroad tracks because his home was in that direction. The first time that Harding observed defendant was when defendant punched Albert. Defendant was not a member of either the Ville group or the Altgeld Gardens group, and Harding does not recall having observed defendant with B.J.'s brother Eugene or with Silvonus Shannon or with any of the other people who were kicking Albert.

¶ 42 The State's next witness was Dantrell Myles, who testified that he was 16 years old and that, in September 2009, he attended Fenger High School and lived in the neighborhood near Fenger known as the Ville. After school on September 24, 2009, he went with Carl Lowery

to the corner store at 111th Street and Normal Avenue. When they left the store, they walked toward the railroad tracks. As a vehicle drove past them with B.J. and his brother, B.J. said "something." Then the vehicle stopped, and the occupants exited and started fighting with Lowery and Myles near the railroad tracks. Then the fight "got large." Afterwards, Myles learned that Albert died as a result of the fight. Myles had known Albert for a couple of months from the neighborhood. Myles later watched a videotape of the incident, and the State played the "slowed-down version" of the videotape in court, while asking Myles questions about what was depicted.

¶ 43    Myles identified Eric Carson on the tape. Myles had known Eric a couple of years, and they were friends. Myles testified that the tape depicted defendant bending down to pick up a board and swinging it. Defendant was in Myles' gym class, as well as his math class with Ms. Muhs. The tape then showed Carson as he hit Albert with the board and defendant as he was about to punch Albert with his fist. Then, it showed a group of boys kicking Albert. Eugene, B.J.'s brother, hit Albert over the head with a stick, and Silvonus stomped on Albert's head with his feet.

¶ 44    On cross-examination, Myles testified that the videotape showed Albert, the victim, throwing punches before he was hit. Myles explained that he kept walking toward the railroad tracks "[b]ecause they was walking toward us, like, they wanted to fight." "[T]hey" were B.J. and his brother. B.J. wanted to fight Carl Lowery, who was Myles' friend, so Myles started fighting too. During the fight, Myles did not notice Albert; Myles was too busy trying to avoid being hit by "[p]eople from the Gardens." Myles had no idea what caused this fight.

¶ 45    The State's next witness, Dominic J., testified that he was 17 years old and presently in the custody of the Cook County department of corrections due to a pending case. In September 2009, he was 16 years old and a sophomore at Fenger High School. Defendant, who was Dominic J.'s younger cousin, was a freshman at Fenger and lived in the area near Fenger known as the Ville. On September 24, 2009, Dominic J. witnessed a fight in school between B.J. who was from the Gardens and Eugene who was from the Ville. (Dominic J. later explained that the "Eugene" with whom B.J. fought was a different person from B.J.'s brother who was also named "Eugene.") After school, Dominic J. left with defendant, Carl, and Dantrell Myles, and they walked toward the railroad tracks. As they were walking, Dominic J. observed B.J. in a vehicle with three or four other people. As B.J. was "hanging out" of the vehicle, he stated "the s*** is not over." Then the vehicle "disappeared," and they kept walking toward the railroad tracks. When they crossed the tracks, Carl and B.J. started fighting. Although Dominic J. was present during the fight, he did not become engaged in it.

¶ 46    Dominic J. testified that he had watched a videotape of the fight in which he observed himself; defendant; Albert, whom Dominic J. knew from school; Eric Carson, who was from the Ville and who was friends with Dominic J.; and Silvonus, who was from the Gardens. The State then played the videotape while asking Dominic J. about what was depicted on it. Dominic J. testified that the tape depicted both defendant and Eric Carson bending down to pick up pieces of wood. Carson swung his board and hit someone; and defendant swung his board trying to hit someone. Then Carson took the board from defendant and used it to hit

-9-

Albert. After being hit, Albert was in the process of standing up, when defendant punched Albert with his fist. Silvonus then stomped on Albert with his feet, and B.J.'s brother Eugene swung a board to hit Albert. Dominic J. testified that the tape depicted defendant running but he could not say whether defendant was running after boys from the Garden.

¶ 47    On cross-examination, Dominic J. testified that he was in custody on a charge of residential burglary for which he could receive 4 to 15 years if convicted. Dominic J. also testified that, normally, he and defendant would leave school each day and walk to defendant's house by traveling down 112th Street. However, on the day of the fight, he and defendant walked down 111th Street because they were expecting trouble due to the fight that had occurred earlier in school. Dominic J. knew that something was going to happen near the railroad tracks on 111th Street, after observing B.J. hanging out of the vehicle. However, later during cross-examination, Dominic J. testified that this was the route that his cousin took every day to walk home.

¶ 48    Dominic J. testified that the first time that Dominic J. observed either wooden sticks or defendant hitting Albert is when he watched the videotape. While Dominic J. was present at the fight, he did not observe anyone pick up sticks, or defendant hit Albert. While Dominic J. was present near the railroad tracks, he observed Albert "walking with the Ville." Dominic J. observed Albert fighting with a person from the Gardens and observed Albert throwing a couple of punches.

¶ 49    Dominic J. testified that, when he watched the videotape, he noticed defendant swinging a stick in the direction of a vehicle, trying to hit B.J. Dominic J. had told defendant about the fight in school which he had witnessed between B.J. and Eugene.

¶ 50    The State's next witness, Detective William Sullivan, testified that he had been a member of the Chicago police department for 16 years, which included being a detective for 10 years and being assigned to homicide with Area 2 for 6 years. Area 2 has its headquarters on 111th Street. On September 24, 2009, he was working with his partner, Detective Michelle Moore-Grose, when they were assigned at 5 p.m. to investigate a fight that had occurred on 111th Street. They went first to Roseland Hospital, where they learned that Albert had been taken to Christ Hospital and Voshon Bullock had been transferred to a hospital in Indiana. The detective later learned that Bullock's nickname was B.J. At Christ Hospital, they learned that Albert had died from his injuries. They then proceeded to Agape Community Center, where they met with T-awanda Piper and learned that the center was equipped with a surveillance camera. Sandy Hankel, another center employee, told him that she had observed someone standing near the fight with a video recorder. The next day, he learned that Fox News had obtained a videotape of the fight from the individual who had recorded it, and a copy was provided to the police. The detective watched that tape well over 100 times, including the slowed-down version. As a result of the investigation into Albert's death, Eric Carson, Silvonus Shannon, Eugene Riley, Lapolean Colbert, and defendant were all arrested and charged with first-degree murder. The investigation revealed that Eugene Riley is the brother of Voshon Bullock, also known as B.J.

¶ 51    The State's next witness, Curtis Thomas, testified that he had been a member of the Chicago police department for over 24 years and a detective since 2001. On September 25,

-10-

2009, he traveled to the area near the Agape Community Center, where he observed a large wooden board. The board was across the street from the center and in the grass. Thomas did not observe any blood, hair or skin tissue on the board.

¶ 52    The State's next witness, Dr. Hilary McElligott, testified that she was the assistant medical examiner who performed the autopsy on Albert's body. A board-certified pathologist, she was accepted, without objection, as an expert in forensic pathology. She opined, within a reasonable degree of medical certainty, that Albert's death was caused by cerebral injuries, due to blunt trauma. At the prosecutor's request, she had watched, approximately a year after performing the autopsy, the videotape of the incident. While watching the videotape, she observed the victim as he was struck with a large wooden board and punched in the face, and as he received further injuries. Dr. McElligott testified: "I believe that punch was a contributing factor to his death." She explained: "I can't pinpoint exactly which injury was a quote, fatal blow, end quote. My determination is that all of these injuries contributed as a whole to his death. *** I can't pinpoint exactly which blow or strike caused exactly which injury to the head region."

¶ 53    On cross-examination, she testified that the fact that a witness observed Albert rise after being punched would not change her opinion that the punch contributed to his death. She explained, by way of analogy, that if a boat had multiple holes and sank, she could not say which hole caused the boat to sink, but she could say that all of them contributed to the sinking. On redirect, she testified that it is possible for a person to rise even after sustaining a traumatic brain injury. On recross, she was asked if it was possible for a single punch to cause the brain "stem" to swell and a person to die, and she testified yes.

¶ 54    The State rested, and the trial court denied defendant's motion for a directed verdict.


¶ 55                        IV. Conviction and Posttrial Proceedings

¶ 56    On December 8, 2010, the jury returned a verdict finding defendant guilty of felony murder, and the trial court entered judgment on the verdict.

¶ 57    The trial court denied defendant's posttrial motion for a new trial and committed defendant to the Illinois Department of Juvenile Justice until age 21. The trial court also sentenced defendant to an adult sentence of 30 years, "the execution of which shall be stayed on the condition that the minor-respondent does not violate the provisions of the juvenile sentence." Defendant filed a motion to reduce sentence, which the trial court denied on March 4, 2011. Defendant then filed a timely notice of appeal on March 4, 2011, and this appeal followed.


¶ 58                                      ANALYSIS

¶ 59    Defendant claims: (1) that the trial court committed reversible error by refusing to instruct the jury on battery, where he presented some evidence that he committed battery and where battery is a lesser-included offense of mob action; (2) that this court must vacate defendant's conviction for felony murder, where the same acts that formed the basis for murder also formed the basis for the predicate felony of mob action; and (3) that the trial

-11-

court erred in designating defendant's case as an EJJP case, where defendant was only 14 years old and had no history of delinquency, his acts involved no premeditation or use of a weapon, and he was amenable to treatment as a juvenile offender.

¶ 60   Defendant also claims that the EJJP statute must be struck down as unconstitutional because it violates a juvenile defendant's due process rights, and is unconstitutionally vague. Specifically, defendant argues: (1) that the EJJP statute violates a juvenile defendant's right to due process because it subjects him to the increased punishment of a conditional adult sentence without a jury finding, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and (2) that it is unconstitutionally vague because it does not provide fair warning of the conduct that will invoke the imposition of an adult sentence.

¶ 61                                    I. Battery

¶ 62   First, defendant claims that the trial court erred by failing to instruct the jury with the misdemeanor offense of battery, because misdemeanor battery is a lesser-included offense of mob action.

¶ 63   However, by the time of trial, defendant was no longer charged with mob action. He was charged only with felony murder. For defendant's argument to succeed, we would have to find: first, that misdemeanor battery is a lesser-included offense of mob action; second, that, when mob action is the predicate felony for a felony murder charge, misdemeanor battery becomes a lesser-included offense of felony murder; and third, that, when a defendant charged with felony murder predicated on mob action shows some evidence of misdemeanor battery, he is then entitled to a jury instruction on misdemeanor battery. We can find no case law to support the third proposition, nor has defendant supplied any. This court has repeatedly held that a party waives a point by failing to provide supporting legal authority. *People v. Ward*, 215 Ill. 2d 317, 332 (2005) ("point raised in a brief but not supported by citation to relevant authority *** is therefore forfeited"); *In re Marriage of Bates*, 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited."); *Lozman v. Putnam*, 379 Ill. App. 3d 807, 826 (2008); *Roiser v. Cascade Mountain, Inc.*, 367 Ill. App. 3d 559, 568 (2006) (by failing to offer supporting legal authority or "any reasoned argument," plaintiffs waived consideration of their theory for asserting jurisdiction over defendant); *Ferguson v. Bill Berger Associates, Inc.*, 302 Ill. App. 3d 61, 78 (1998) ("it is not necessary to decide this question since the defendant has waived the issue" by failing to offer case citation or other support as Supreme Court Rule 341 (Ill. S. Ct. R. 341 (eff. Feb. 1, 1994)) requires).

¶ 64   This court reviews a trial court's decision to decline to give a jury instruction under an abuse of discretion standard. *People v. Davis*, 213 Ill. 2d 459, 475 (2004) (when defendant was charged with felony murder based on mob action, our supreme court reviewed the trial court's denial of defendant's proposed involuntary manslaughter instruction only for an abuse of discretion). " 'An abuse of discretion occurs when no reasonable person would take the view adopted by the court.' " *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 26 (quoting *Trettenero v. Police Pension Fund*, 333 Ill. App. 3d 792, 801 (2002)).

¶ 65   To prove felony murder, the State must prove that the defendant, without lawful

justification, caused a person's death while "attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 2008); *People v. Phillips*, 383 Ill. App. 3d 521, 535 (2008). A "forcible felony" is defined, in relevant part, as: "aggravated battery resulting in great bodily harm or permanent disability or disfigurement and any other felony which involves the use or threat of physical force or violence against any individual." 720 ILCS 5/2-8 (West 2008).

¶ 66 In the case at bar, defendant did not seek an instruction for aggravated battery at trial, and he does not argue for it now on appeal, so that issue is not before us.[4] If defendant's theory was taken to its absurd but logical conclusion, disorderly conduct could just as easily become a required "lesser-included offense" instruction for felony murder predicated on mob action, as misdemeanor battery. 720 ILCS 5/26-1 (West 2008) ("disorderly conduct" includes any act done "in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace").

¶ 67 In *Davis*, the supreme court held that involuntary manslaughter was not a lesser-included offense of felony murder predicated on mob action. *Davis*, 213 Ill. 2d at 477. To be a lesser-included offense, the lesser offense must have a less culpable mental state than or an equally culpable mental state as the charged offense. *Davis*, 213 Ill. 2d at 477. The supreme court reasoned that involuntary manslaughter was not a lesser-included offense, because felony murder "does not include a culpable mental state as to the killing while the offense of involuntary manslaughter requires a reckless mental state." *Davis*, 213 Ill. 2d at 477. In reaching this conclusion, the supreme court considered only the mental state required for the murder and not the mental state required for the underlying felony of mob action. *Davis*, 213 Ill. 2d at 477. In the case at bar, defendant asks us to do what the supreme court refused to do, which is to consider the mental state of the predicate felony. Defendant claims that *Davis* was wrongly decided, arguing that "the analysis in *Davis* ignored a fundamental requirement of every felony murder indictment: the predicate felony." Defendant's argument, however, that the supreme court should vacate one of its cases, is an argument he will have to make to a different court. *People v. Phillips*, 383 Ill. App. 3d 521, 546 (2008) (this court was "unpersuaded" when another defendant made the same argument that "the approach taken by the supreme court in *Davis* was too narrow").

¶ 68 For the foregoing reasons, we find that the trial court did not abuse its discretion by denying defendant's proposed jury instruction for misdemeanor battery.


¶ 69         II. Mob Action and Felony Murder

¶ 70 Second, defendant asks this court to vacate his conviction for felony murder, on the ground that the same acts that formed the basis for the murder also formed basis for the

---

[4]Prior to oral argument, defendant moved to cite as additional authority *People v. Schmidt*, 392 Ill. App. 3d 689, 694-96 (2009), in which this court held that an aggravated battery that does not result in great bodily harm cannot serve as a forcible felony for purposes of the felony murder statute. However, as stated above, defendant did not seek an instruction for aggravated battery at trial, so that issue is not before us.

predicate felony of mob action.

¶ 71    The supreme court has held that, where the acts constituting a forcible felony arise from and are inherent in the act of murder itself, those acts cannot also serve as the predicate felony for a charge of felony murder. *People v. English*, 2013 IL 112890, ¶ 29 (quoting *People v. Morgan*, 197 Ill. 2d 404, 447 (2001)). This rule is known as the same-act doctrine. *People v. Davison*, 236 Ill. 2d 232, 243 (2010) (our supreme court reaffirmed its adherence to "the same-act *** doctrine for felony murder"). Since this issue presents solely a question of law, we review it *de novo*. *Davison*, 236 Ill. 2d at 239 (the question of whether "the conduct constituting mob action arose from and was inherent in the act of murder itself" was "solely" a question of law to be reviewed *de novo*). *De novo* consideration means that we review the issue independently from the trial court's judgment. *A Plus Janitorial Co. v. Group Fox, Inc.*, 2013 IL App (1st) 120245, ¶ 14.

¶ 72    As noted above, the petition charges only one predicate felony for the felony murder count, mob action, and it charges only one of the three subsections of the mob action statute, subsection 25-1(a)(1). In 2009 when this offense was committed, it stated that: "(a) Mob action consists of any of the following: (1) [t]he use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law ***." 720 ILCS 5/25-1(a)(1) (West 2008). Thus, under a plain reading of the 2009 statute, the State had to prove: (1) that defendant was one of two or more people acting together and without authority of law; (2) that these two or more people used force or violence; and (3) that this use of force or violence disturbed the public peace. In 2009, the statute did not require the State to prove that defendant was the one who used force or violence; the State had to prove only that defendant was acting together with persons who did use force or violence. *Davis*, 213 Ill. 2d at 471, 474 (applying the same subsection of the mob action statute, our supreme court held that the State did not have to prove that defendant used force against the victim); *People v. Cotton*, 393 Ill. App. 3d 237, 258 (2009).

¶ 73    However, effective January 1, 2010, the statute was amended to read: "A person commits the offense of mob action *when he or she engages in any of the following: *** the knowing or reckless use of force or violence* disturbing the public peace by 2 or more persons acting together and without authority of law." (Emphasis added.) 720 ILCS 5/25-1(a)(1) (West 2010). A plain reading of the 2010 amendment shows that the State then had to prove that defendant was the one who engaged in the use of force or violence and that he did so knowingly or recklessly. *Landry v. Daley*, 280 F. Supp. 938, 956 (N.D. Ill. 1968) (when a statute uses the words "engaged in," it means that the accused must have been "occupied in or employed in" the action named). However, that was not the law in effect at the time the offense was committed, and we apply the statute that was in effect at the time of the offense. *People v. Freeman*, 404 Ill. App. 3d 978, 986 (2010).

¶ 74    Thus, defendant's argument fails under a plain reading of the statute. Defendant's argument is that the same punch by defendant which the State used to establish defendant's causation of the murder was the same punch which the State relied on to show that defendant used force for purposes of mob action. However, defendant is mistaken, because the State was not required to show in 2009 that it was defendant who used force. The State was required to establish only that defendant was acting in concert with others who did use force

-14-

or violence, which it did establish in the case at bar.

¶ 75    Second, even if we were to assume that the 2010 amendment applied here, it would not help defendant. During its closing argument to the jury, the State argued that there were other acts, besides the punch, that constituted a use of force by defendant. The evidence established that, prior to the punch, defendant used a wooden board to swing at someone other than the murder victim and that, after the punch, defendant was chasing other victims. With this evidence, the State showed that the punch, which was the basis for the murder charge, occurred in the middle of defendant's "mob action" or his use of force or violence against others. Thus, whether we apply the 2009 statute or the 2010 amendment, we must find that the felony murder charge and its predicate felony of mob action were based on separate acts.

¶ 76    The case at bar is similar to *People v. Davison*, 236 Ill. 2d 232, 242-43 (2010), in which our supreme court affirmed a defendant's felony murder conviction based on mob action. The *Davison* defendant made the same argument as defendant in the case at bar, namely, that the acts constituting the predicate felony of mob action were the same acts inherent in the commission of the murder. *Davison*, 236 Ill. 2d at 239. In *Davison*, the defendant and three other men searched for the victim, located him, chased him and finally beat and stabbed him. *Davison*, 236 Ill. 2d at 234. The victim died as a result of blood loss from 20 stab wounds. *Davison*, 236 Ill. 2d at 235. Our supreme court rejected the defendant's argument that the same acts constituted both mob action and murder, on the grounds that (1) "the predicate felony of mob action [was complete] before the end of the aggression that eventually resulted in the victim's death"; and (2) "the victim died as the result of cumulative blood loss from the 20 stab wounds inflicted by defendant and his three co-offenders, rather than any particular wounds inflicted by defendant alone." *Davison*, 236 Ill. 2d at 242, 243.

¶ 77    Similarly, in the case at bar, the predicate felony of mob action was complete "before the end of the aggression that eventually resulted in the victim's death." *Davison*, 236 Ill. 2d at 242. The predicate felony was complete when defendant bent down to pick up a wooden board and started swinging it, and his swing was not toward the murder victim. Also, as in *Davison*, the murder victim in the case at bar died as the result of multiple injuries inflicted by defendant and his co-offenders, "rather than any particular wounds inflicted by defendant alone." *Davison*, 236 Ill. 2d at 243. Thus, applying the reasoning of *Davison* to the facts at bar, we find that the acts inherent in the murder and the acts constituting the mob action were not the same.

¶ 78    The State argues that we should not have even reached this issue because it was forfeited. However, we find that defendant did not forfeit this issue because he preserved this issue by raising it both at trial and in a posttrial motion. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). First, defendant objected at trial. When he moved for a directed verdict, he stated "mob action cannot be the predicate felony for felony murder in this case because mob action causing bodily harm is implicit in the death of Derrion Albert, and it is duplicative. So mob action should not be the underlying predicate felony that justifies felony murder in this case." The State responded that "[i]t is all of his actions before the throwing of the punch that allowed him to be found guilty of being a participant, an active participant in the mob action." The trial court did not find defendant's argument persuasive and denied the motion for a directed verdict. Next, in a posttrial motion, defendant claimed that the trial court erred

-15-

in denying the directed verdict motion. Since defendant objected both during trial and in a posttrial motion, he preserved this issue for our review. *Woods*, 214 Ill. 2d at 470.

¶ 79     In addition, defendant's argument is preserved for our review because it is directed to the sufficiency of the evidence. "[W]hen a defendant makes a challenge to the sufficiency of the evidence, his or her claim is not subject to the waiver rule and may be raised for the first time on direct appeal." *Woods*, 214 Ill. 2d at 470. In order to prove felony murder, the State has the burden of proving separate acts and a separate felonious purpose underlying the murder, which are separate and distinct from the acts and purpose underlying the predicate felony. *English*, 2013 IL 112890, ¶ 29; *Davison*, 236 Ill. 2d at 243-44 (reaffirming its adherence to the same-act doctrine and rejecting the State's invitation to rely only on an analysis of whether the felonious purpose underlying the predicate felony was distinct from an intent to kill). Defendant's argument here is that the State's evidence was insufficient because it failed to show separate acts underlying the murder and the mob action. Since defendant's argument was directed at the sufficiency of the evidence at trial, this argument was not waived for our review on appeal. Thus, we considered his argument on review, but we do not find it persuasive for the reasons already considered above.

¶ 80                                  III. Designation as an EJJP Case

¶ 81     Third, defendant claims that the trial court abused its discretion when it designated defendant's case EJJP, because (1) defendant was only 14 years old at the time of the offense; (2) he had no prior record of criminal acts or delinquency; (3) his participation in the offense at issue involved no premeditation or use of a weapon; and (4) he was amenable to treatment as a juvenile offender.

¶ 82     We will reverse a trial court's decision to designate a case EJJP only if the trial court abused its discretion. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 26. As noted, " '[a]n abuse of discretion occurs when no reasonable person would take the view adopted by the court.' " *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 26 (quoting *Trettenero v. Police Pension Fund*, 333 Ill. App. 3d 792, 801 (2002)).

¶ 83     The purpose of designating a case as EJJP is to provide additional deterrence by subjecting the minor, if found guilty, to both a juvenile sentence and a conditional adult sentence. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 24; 705 ILCS 405/5-810(4) (West 2010). The adult sentence is conditional because it is stayed on the condition that the minor does not violate the provisions of his juvenile sentence. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 24; 705 ILCS 405/5-810(4) (West 2010). If the minor satisfactorily completes his juvenile sentence, the adult sentence is vacated. 705 ILCS 405/5-810(7) (West 2010).

¶ 84     The first step under the EJJP statute is for the State to file a petition, at any time prior to trial, to designate the minor's case as an EJJP case. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 25; 705 ILCS 405/5-810(1)(a) (West 2010). The State's petition must allege that the minor was 13 years of age or older at the time of the offense and that the offense would be a felony if committed by an adult. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 25; 705 ILCS 405/5-810(1)(a) (West 2010). There is no dispute in the case at bar that the State satisfied this first step.

¶ 85    The next step is a determination by the juvenile judge that there is probable cause to believe that the allegations in the petition are true. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 25; 705 ILCS 405/5-810(1)(a) (West 2010). In the case at bar, the juvenile judge made such a determination, and no claims are raised on appeal to challenge it.

¶ 86    Once the juvenile judge makes a probable cause determination, it creates "a rebuttable presumption that the proceeding shall be designated as an extended jurisdiction juvenile proceeding." 705 ILCS 405/5-810(1)(a) (West 2010); *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 25. The judge must enter an order designating the case as an EJJP case, unless the court finds, based on clear and convincing evidence, that sentencing the minor as an adult would not be appropriate for the minor. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 25; 705 ILCS 405/5-810(1)(b) (West 2010). The EJJP statute provides a list of five factors which the trial court must evaluate when making this decision: (1) the minor's age; (2) prior history, including his juvenile record, mental and physical health, and his educational and social background; (3) the circumstances and seriousness of the offense; (4) the advantages of treating the minor within the juvenile justice system; and (5) the security needs of the public. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 25; 705 ILCS 405/5-810(1)(b) (West 2010).

¶ 87    When evaluating the five listed factors, the trial court must give greater weight to (1) the seriousness of the alleged offense and (2) the minor's prior criminal or juvenile record, than to any of the other listed factors. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 26, 705 ILCS 405/5-810(1)(b) (West 2010). In the case at bar, it is undisputed that defendant had no prior criminal or juvenile record. In light of his nonexistent record, defendant argues that the trial court failed to consider his rehabilitative potential. In addition, with respect to the seriousness of the offense, defendant argues that his role in the offense was limited.

¶ 88    We acknowledge that defendant was only 14 years old, that he had no prior criminal or juvenile record, and that he had rehabilitative potential; however, we cannot say that the trial court abused its discretion, in light of the seriousness of the offense. As a reviewing court, we are not called upon to determine what we would do if we were presiding as the trial court; rather, we may reverse only if no reasonable person would take the view adopted by the trial court. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 26 (quoting *Trettenero*, 333 Ill. App. 3d at 801). In the case at bar, we cannot say that the trial court's designation was unreasonable, for the reasons discussed below.

¶ 89    The record before us shows that the trial court carefully considered each and every factor listed in the EJJP statute. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 36 (citing *In re Dontrale E.*, 358 Ill. App. 3d 136, 141 (2005)). This is not a case where defendant claims that the trial court failed to discuss a particular factor. *People v. Clark*, 119 Ill. 2d 1, 14 (1987) (our supreme court found that the transfer hearing was inadequate where the juvenile judge failed to consider all of the listed factors). Instead, defendant challenges only the trial court's weighing of the factors, asserting that the trial court abused its discretion by not giving more weight to defendant's lack of a prior record and his rehabilitative potential.

¶ 90    What this argument overlooks is that the seriousness of the offense is one of the two most important factors that the trial court must consider. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 26, 705 ILCS 405/5-810(1)(b) (West 2010). The State's proffer showed that

-17-

defendant participated in a mob action and punched a minor in the face without any known personal animosity toward that minor. Defendant knocked the minor down as the minor was struggling to rise, thereby making him an easy target for the mob which eventually surrounded and participated in killing him. In light of the seriousness of the offense, we cannot say that the trial court abused its discretion by designating defendant's case as an EJJP case–subjecting defendant to an adult sentence that he may never have to serve.

¶ 91                    IV. *Apprendi* and Vagueness Claims

¶ 92    Defendant also claims that the EJJP statute must be struck down as unconstitutional because it violates a juvenile defendant's due process rights and is unconstitutionally vague. Specifically, defendant argues: (1) that the EJJP statute violates a juvenile defendant's right to due process because it subjects him to the increased punishment of a conditional adult sentence without a jury finding, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and (2) that it is unconstitutionally vague because it does not provide fair warning of the conduct that will invoke the imposition of the adult sentence.

¶ 93    These exact same constitutional challenges were resolved by this court in a prior opinion, *In re Omar M.*, 2012 IL App (1st) 100866; and recently, our supreme court adopted our reasoning concerning *Apprendi*, stating "[w]e agree with the reasoning put forth by our appellate court" (*In re M.I.*, 2013 IL 113776, ¶ 44).

¶ 94                                A. *Apprendi*

¶ 95    In his brief to this court, defendant argues that "the facts that qualify the juvenile for prosecution under the EJJP statute are not required to be submitted to a jury for a determination or proved beyond a reasonable doubt." In *Omar M.*, the defendant made almost the exact same argument that the effect of an EJJP "designation is to expose a respondent to the longer adult sentence based on information found by the judge on the basis of only probable cause." *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 62.

¶ 96    In the case at bar, defendant argues, "[b]ecause the EJJP statute did not require that the facts used to extend [his] sentence beyond the maximum juvenile sentence *** be proved to a jury beyond a reasonable doubt, the EJJP statute violated *** *Apprendi*." In *Omar M.*, we answered this argument, explaining "the statutory maximum for *Apprendi* purposes is not the maximum punishment allowed in the juvenile system." *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 63. In *Omar M.*, as in the case at bar, "a jury found every element required for the statutory sentence beyond a reasonable doubt," and "[t]he sentence was within the statutory range of 20 to 60 years for first-degree murder." *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 64. Thus, there was no *Apprendi* violation. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 65.

¶ 97    In his brief, defendant acknowledged that at least four appellate court decisions have held that the EJJP statute did not violate *Apprendi*. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 65; *In re J.W.*, 346 Ill. App. 3d 1, 10-12 (2004); *In re Christopher K.*, 348 Ill. App. 3d 130, 142-43 (2004), *aff'd in part & rev'd in part on other grounds*, 217 Ill. 2d 348, 363 (2005); *In re Matthew M.*, 335 Ill. App. 3d 276, 286-90 (2002). Nonetheless, defendant argued that these cases were wrongly decided. However, between the filing of his brief and the filing of our

opinion, our supreme court issued an opinion adopting the reasoning of these appellate cases and thus settling, once and for all in this state, the outcome of this argument. *In re M.I.*, 2013 IL 113776, ¶¶ 44, 46.

¶ 98        Citing with approval our opinion in *Omar M.*, our supreme court agreed, stating: "for the purposes of *Apprendi*, the statutory maximum is not the juvenile sentence under the Juvenile Court Act, but rather the maximum sentence allowed by the offense committed." *In re M.I.*, 2013 IL 113776, ¶ 46. Our supreme court explained that, where the fact finder "found every element for the statutory sentence beyond a reasonable doubt," and where the sentence was "within the statutory range of the criminal offense," there was no *Apprendi* violation. *In re M.I.*, 2013 IL 113776, ¶ 46.

¶ 99                                    B. Vagueness

¶ 100        In his brief to this court, defendant also claims that the EJJP statute is "unconstitutionally vague, because it [1] does not provide fair warning of the conduct that will invoke the imposition of the adult sentence and [2] fails to provide adequate guidance to authorities called upon to enforce its provisions."

¶ 101        The EJJP statute provides that a court *may* revoke the stay of a minor's adult sentence if he "violate[s] the *conditions* of his or her sentence" and *shall* revoke the stay if he "committed a new *offense*." (Emphases added.) 705 ILCS 405/5-810(6) (West 2008). In the case at bar, defendant claims: that the words "conditions" and "offense" are unconstitutionally vague and that, although the EJJP statute permits a court to revoke the stay after a violation of "conditions," it provides no guidelines concerning when the court should do so.

¶ 102        As we explained in *Omar M.*, the term "conditions" explicitly refers to the " 'conditions of *his or her sentence*.' " (Emphasis in original.) *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 84 (quoting 705 ILCS 405/5-810 (6) (West 2008)). "Where the trial court orders provisions such as probation or drug counseling in addition to the juvenile detention term, those provisions of the juvenile sentence would be part of the *** 'conditions.' Where the trial court does not impose any additional provisions at sentencing, the term 'conditions' refers only to the minor's completion of his or her sentence and the minor's adherence to the Illinois Department of Corrections (IDOC) rules and regulations during that time." *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 84; *Christopher K.*, 348 Ill. App. 3d at 146, 147 (finding that the EJJP statute was not vague, the appellate court held that a juvenile violates the "conditions of his or her sentence" by a "failure to comply with the juvenile sentence"), *aff'd in part & rev'd in part on other grounds*, 217 Ill. 2d 348, 363 (2005). As a result, this term is not vague. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 84.

¶ 103        The court in *Omar M.* also addressed the challenge to the meaning of the term "offense": "The term 'offense' is equally plain and unambiguous, meaning 'criminal offense.' " *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 85. Accord *Christopher K.*, 348 Ill. App. 3d at 147 ("we find the legislature must have meant 'offense' as a criminal offense as such is defined in the Criminal Code"), *aff'd in part & rev'd in part on other grounds*, 217 Ill. 2d 348, 363 (2005). As for the alleged lack of guidance, the court explained, "[c]ontrary to [defendant's]

claim, the Juvenile Court Act's section on 'Purpose and policy' provides guidance to trial court judges," and the Act "explicitly grants trial court judges discretion to affect these goals." *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 88. For these reasons, we found in *Omar M.*, and we still continue to find, that the EJJP statute is not unconstitutionally vague. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 91 ("Because the terms of the [EJJP] statute are plain and unambiguous, the statute satisfies due process requirements and is not unconstitutionally vague."); accord *Christopher K.*, 348 Ill. App. 3d at 146-47, *aff'd in part & rev'd in part on other grounds*, 217 Ill. 2d 348, 363 (2005). Our supreme court concluded in *Christopher K.* that no authoritative determination of the vagueness issues was necessary at that time, since the appellate court had thus far uniformly rejected defendant's claims that the EJJP statute was vague. *Christopher K.*, 217 Ill. 2d at 362.

¶ 104    In its motion to cite additional authority, the State argued that the supreme court's recent decision in *In re M.I.*, 2013 IL 113776, ¶ 36, resolved defendant's vagueness claim. However, the *M.I.* opinion does not decide defendant's claim for the following reason. In *In re M.I.*, 2013 IL 113776, ¶ 36, the supreme court held that a defendant lacked standing, on the particular facts and circumstances of the case before it, to raise a vagueness challenge to the term "conditions" in the EJJP statute. In *In re M.I.*, 2013 IL 113776, ¶ 34, the State had already filed a petition to revoke the stay of the juvenile defendant's adult sentence, and had done so solely on the ground that the defendant had committed a new felony offense. However, on appeal, the *M.I.* defendant claimed only that the term "conditions" was vague, but he did not claim that the term "offense" was vague in any way. *In re M.I.*, 2013 IL 113776, ¶ 36. Since any vagueness in the term "conditions" was going to have no impact on him, our supreme court held that he lacked standing to challenge the vagueness of that particular term. *In re M.I.*, 2013 IL 113776, ¶ 36. However, our supreme court emphasized the narrow precedential effect of its holding in *In re M.I.*, 2013 IL 113776, ¶ 36, by stating that it made "no determination today whether a petition to revoke the stay must be granted or even filed to trigger standing."

¶ 105    Lastly, defendant argues that the EJJP statute is not only facially vague but is also vague as applied to him because the trial court failed to outline conditions specific to his juvenile sentence. We reject this argument for the same reason that we rejected his facial challenge. As we explained above, "[w]here the trial court does not impose any additional provisions at sentencing, the term 'conditions' refers only to the minor's completion of his or her sentence and the minor's adherence to the Illinois Department of Corrections (IDOC) rules and regulations during that time." *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 84; *Christopher K.*, 348 Ill. App. 3d at 146, *aff'd in part & rev'd in part on other grounds*, 217 Ill. 2d 348, 363 (2005). As a result, this term is neither facially vague nor vague as applied to defendant. *In re Omar M.*, 2012 IL App (1st) 100866, ¶ 97 ("we find that the statute satisfied due process [as applied] for the same reasons that the statute is not vague on its face").

¶ 106                                 CONCLUSION

¶ 107    On this direct appeal, defendant claimed: (1) that the trial court committed reversible

error by refusing to instruct the jury on battery, where battery is a lesser-included offense of mob action and, thus, a lesser included offense of felony murder predicated on mob action; (2) that this court must vacate defendant's conviction for felony murder, where the same acts that formed the basis for murder also formed the basis for the predicate felony of mob action; and (3) that the trial court erred in designating defendant's case as an EJJP case, where defendant was only 14 years old, he had no history of delinquency, his acts involved no premeditation or use of a weapon, and he was amenable to treatment as a juvenile offender.

¶ 108    Defendant also claimed that the EJJP statute must be struck down as unconstitutional because it violates a juvenile defendant's due process rights, and because it is unconstitutionally vague. Specifically, defendant argued: (1) that the EJJP statute violates a juvenile defendant's right to due process because it subjects him to the increased punishment of a conditional adult sentence without a jury finding, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and (2) that it is unconstitutionally vague because it does not provide fair warning of the conduct that will invoke the imposition of the adult sentence.

¶ 109    For the foregoing reasons, we do not find these arguments persuasive and, thus, we affirm.


¶ 110    Affirmed.